# EXHIBIT 2

## IN THE DISTRICT COURT OF CREEK COUNTY, BRISTOW DIVISION
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| Johnny Dale Floyd; Virginia Floyd; Jennifer Gail Robinson; Lorena Ann Goforth; and Joanna Paul, | ) ) ) ) | FILED IN DISTRICT COURT CREEK COUNTY BRISTOW OK |
| | ) | NOV - 6 2020 |
| Plaintiffs, | ) ) | TIME _9:34 am_ |
| | ) | Amanda VanOrsdol, Court Clerk |
| v. | ) | Case No _BCJ - 2020 - 00025_ |
| | ) | |
| BP p.l.c.; Atlantic Richfield Company; BP Corporation North America Inc.; BP America Inc.; BP Pipelines (North America) Inc.; Marathon Oil Corporation; Marathon Oil Company; Marathon Petroleum Corporation; Marathon Petroleum Company LP; Kinder Morgan, Inc.; EPEC Oil Company Liquidating Trust; El Paso Tennessee Pipeline Co., L.L.C.; El Paso Energy, E.S.T. Co.; EPEC Oil Company; Midwestern Gas Transmission Co.; Bolin Oil Company, a Partnership, its partners, Daniel Houston Bolin, Daniel Phillips Bolin, Robert Lee Bolin, Charles William Bolin, and the successors of the Bolins; and Philip Elias, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PETITION

COME NOW Plaintiffs, JOHNNY DALE FLOYD ("Pastor Floyd"), VIRGINIA

FLOYD ("Mrs. Floyd"), JENNIFER GAIL ROBINSON, LORENA ANNE GOFORTH,

AND JOANNA PAUL (collectively, the "Floyd Family" or "Plaintiffs"), and file this

*Petition*. For their claims for relief against Defendants, BP p.l.c. ("BP"), ATLANTIC

RICHFIELD COMPANY ("ARCO"), BP CORPORATION NORTH AMERICA INC.

("BP Corp."), BP AMERICA INC. ("BP America"), BP PIPELINES (NORTH AMERICA)

INC. ("BP Pipelines" and, collectively with BP, ARCO, BP Corp., and BP America, the

"BP Defendants"), MARATHON OIL CORPORATION, MARATHON OIL COMPANY,

MARATHON   PETROLEUM   CORPORATION,   MARATHON   PETROLEUM

COMPANY, LP (collectively the "Marathon Defendants"), KINDER MORGAN, INC.

("Kinder Morgan"), the EPEC OIL COMPANY LIQUIDATING TRUST (the "Trust"), EL

PASO TENNESSEE PIPELINE CO., L.L.C. ("Tennessee Pipeline"), El PASO ENERGY

E.S.T. CO. ("EPE"), individually and in its capacity as the trustee of the Trust, the EPEC

OIL COMPANY ("EPEC" and, collectively with Kinder Morgan, EPE, the Trust, and

Tennessee Pipeline, the "Kinder Morgan Defendants"),[1] MIDWESTERN GAS

TRANSMISSION CO. ("Midwestern"),   BOLIN OIL COMPANY, a Partnership, its

partners DANIEL HOUSTON BOLIN, DANIEL PHILLIPS BOLIN, ROBERT LEE

BOLIN, AND CHARLES WILLIAM BOLIN, and their successors (the "Bolins"), and

PHILIP ELIAS ("Elias"). Plaintiffs allege and state as follows:

1.     Pastor Floyd was employed as the pastor of the Bristow First Assembly of

God from approximately 1991 through 1995. During that time, the Floyd Family resided

at the parsonage on the Church Property. The Church Property (including the parsonage)

is defined herein as the following tracts:

---

[1]     The BP Defendants, Marathon Defendants, Kinder Morgan Defendants, Bolin Defendants, and Elias Defendant are collectively referred to herein as the "Operational Defendants," which includes all of their respective predecessor companies and affiliates.

Tract 1:     That part of the Northwest Quarter of the Northwest Quarter (NW/4 NW/4) lying North and West of the right of way of the St. Louis and San Francisco Railway Company in Section 29, Township 16 North, Range 9 East, less and except approximately 1/2 acre thereof conveyed by deed dated February 27, 1917, recorded April 16, 1971, in Book 146, Page 347, from Continental Refining Company to St. Louis San Francisco Railway Company;

Tract 2:     A tract of land in the Southwest Quarter of the Southwest Quarter (SW/4 SW/4) of Section 20-16N-9E, more particularly described as follows: Beginning at the Southwest corner of said Section 20; thence S 89° 35' 48" E, 660 feet; thence N 74° 12' 47"W, 174.83 feet; thence N 66° 48' 11" W, 299.01 feet; thence N 70° 09' 35" W, 230.85 feet; thence S 00° 03' 31" E, 239.04 feet to point of beginning; and

Tract 3:     A tract of land containing the east two acres in the NE/4 of the NE/4 of Section 30, Township 16 North, Range 9 East, Creek County, Oklahoma.

As of the date of filing of this *Petition*, Pastor Floyd, Mrs. Floyd and Joanna Paul are residents of Sequoyah County, Oklahoma. Jennifer Robinson and Lorena Goforth are residents of Arkansas.

2.     Recently, the Floyd Family has learned that Operational Defendants' industrial activities on and around the Church Property exposed the family to hazardous chemicals and contaminants and that the property on which the family lived is now a Superfund site. Members of the Floyd Family suffered and continue to suffer significant negative health effects, annoyance, inconvenience, and other harm caused in part or in whole from Operational Defendants' pollution, activities, failure to act, failure to disclose, and coverup.

**A.**   **Background and Overview of BP Defendants**

3.     Defendant BP is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England. Its agent in the United States is BP America, with its principal place of business in Houston, Texas. BP is the surviving and controlling entity, through acquisition and/or merger, of predecessor entities,[2] which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs. As a surviving successor entity, BP has, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over its and its predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto.

4.     Defendant ARCO is a corporation organized and existing under the laws of the State of Delaware. ARCO may be served through its registered agent: The Corporation

---

[2]     By way of example and not by limitation, the Prairie Oil & Gas Company was an owner and conducted operations on the Wilcox Site (as defined in paragraph 20 herein) from approximately March of 1927 through June of 1929. Prairie became Sinclair Oil & Gas Company. Sinclair became ARCO. Pleading in the alternative, if necessary, ARCO merged into, became part of, and is controlled by BP.

Sinclair Oil & Gas Company was an owner and conducted operations on the Wilcox Site beginning in approximately 1929. Sinclair became ARCO. Pleading in the alternative, if necessary, ARCO merged into, became part of, and is controlled by BP.

Standard Oil Company of Indiana was an owner and conducted operations on the Wilcox Site beginning in approximately November of 1915 and going forward. Standard (Stanolind) became Amoco. Amoco became BP Corp. Pleading in the alternative, if necessary, BP Corp. merged into, became part of, and is controlled by BP.

Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128. ARCO is a surviving and controlling entity, through acquisition or merger, of predecessor entities,[3] which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs. As a surviving successor entity, ARCO has, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over its and its predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto.

5.      Defendant BP Corp. is a corporation organized and existing under the laws of the State of Indiana. BP Corp. is not registered to do business in Oklahoma and may be served through its last address known to Plaintiffs: 501 Westlake Park Boulevard, Houston, Texas 77079. BP Corp. is a surviving and controlling entity, through acquisition or merger, of predecessor entities,[4] which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed

---

[3]      By way of example and not by limitation, the Prairie Oil & Gas Company was an owner and conducted operations on the Wilcox Site from approximately March of 1927 through June of 1929. Prairie became Sinclair Oil & Gas Company. Sinclair became ARCO. Pleading in the alternative, if necessary, ARCO merged into, became part of, and is controlled by BP.

Sinclair Oil & Gas Company was an owner and conducted operations on the Wilcox Site beginning in approximately 1929. Sinclair became ARCO. Pleading in the alternative, if necessary, ARCO merged into, became part of, and is controlled by BP.

[4]      By way of example and not by limitation, Standard Oil Company of Indiana was an owner and conducted operations on the Wilcox Site beginning in approximately November of 1915 going forward. Standard (Stanolind) became Amoco. Amoco merged with British Petroleum in 1998, and through multiple reorganizations, BP claims that the former Amoco is now known as BP Corp., the entity that purports to employ all of BP's North American personnel. Pleading in the alternative, if necessary, BP Corp. merged into, became part of, and is controlled by BP.

by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs. As a surviving successor entity, BP Corp. has, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over its and its predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto. BP Corp. is the employer of all BP personnel in North America for all BP related entities and is the owner of all facilities used by all BP personnel in North America. BP Corp.'s employees perform all of BP's North American operations under the control of BP's executive committee.

6.      Defendant BP Pipelines is a corporation organized and existing under the laws of the State of Maine. BP Pipelines may be served through its registered agent: The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128. BP Pipelines is a surviving and controlling entity, through acquisition and/or merger, of predecessor entities,[5] which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs. As a surviving successor entity, BP Pipelines has, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over its and

---

[5]      By way of example and not by limitation, the Sinclair-Cudahy Pipe Line Co. was an owner and conducted operations on the Wilcox Site beginning approximately in May of 1921. Sinclair-Cudahy Pipe Line Co. became Sinclair Pipe Line Co. Sinclair Pipe Line Co. became Stanolind Pipe Line Co. Stanolind Pipe Line Co. became Service Pipe Line Co. Service Pipe Line Co. became Amoco Pipeline Co. Amoco Pipeline Co. became BP Pipelines. Pleading in the alternative, if necessary, BP Pipelines merged into, became part of, and is controlled by BP.

its predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto.

7.     Defendant BP America is a corporation organized and existing under the laws of the State of Delaware.  BP America may be served through its registered agent: The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128. BP is the surviving and controlling entity, through acquisition and/or merger, of predecessor entities,[6] which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs. As a surviving successor entity, BP has, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over its and its predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto. BP America is BP's agent in North America and is part of and controlled by BP.

---

[6]     By way of example and not by limitation, the Prairie Oil & Gas Company was an owner and conducted operations on the Wilcox Site from approximately March of 1927 through June of 1929. Prairie became Sinclair Oil & Gas Company. Sinclair became ARCO. Pleading in the alternative, if necessary, ARCO became BP. Pleading in the alternative, if necessary, ARCO merged into, became part of, and is controlled by BP.

Sinclair Oil & Gas Company was an owner and conducted operations on the Wilcox Site beginning in approximately 1929. Sinclair became ARCO. Pleading in the alternative, if necessary, ARCO merged into, became part of, and is controlled by BP.

Standard Oil Company of Indiana was an owner and conducted operations on the Wilcox Site beginning in approximately November of 1915 going forward. Standard (Stanolind) became Amoco. Amoco became BP Corp. Pleading in the alternative, if necessary, Amoco and/or BP Corp. merged into, became part of, and is controlled by BP.

B.     Background and Overview of Marathon Defendants

8.     Defendant Marathon Oil Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Houston, Texas.

9.     Defendant Marathon Petroleum Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Findlay, Ohio.

10.     Defendant Marathon Oil Company is organized and existing under the laws of Ohio. Marathon Oil Company may be served through its registered agent: The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

11.     Defendant Marathon Petroleum Company LP is organized and existing under the laws of Delaware. Marathon Petroleum Company LP may be served through its registered agent: The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

12.     Collectively, the Marathon Defendants are the surviving and controlling entities, through name change, split, acquisition and/or merger, of predecessor entities, including but not limited to Marathon Oil Corporation, The Ohio Oil Company, Continental Refining Company, Continental Oil Company, and Transcontinental Oil

Company[7] all of which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, and all of which have injured and are continuing to injure Plaintiffs.

13.     By way of example, and not by way of limitation, the Marathon Defendants are the surviving and controlling entities, through name change, split, acquisition and/or merger, of predecessor entities (including, but not limited to, Continental Refining Company, Continental Oil, The Ohio Oil Company, and Transcontinental Oil Company) that owned, controlled, and operated all or part of the Transcontinental Refinery (as hereinafter defined) and the Wilcox Site.

14.     As the surviving successors, the Marathon Defendants have, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over their and their predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto.

---

[7]     By way of example and not by limitation, the Marathon Oil Company was an owner and conducted operations on the Wilcox Site from approximately August of 1930 to September of 1936.

The Ohio Oil Company was an owner and conducted operations on the Wilcox Site and the property north and up-gradient of the Wilcox Site, where the Transcontinental/Ohio Refinery and associated facilities were located, for at least 20 years from 1922 or before. The Ohio Oil Company became Marathon by name change.

Transcontinental Oil Company was an owner and conducted operations on the Wilcox Site and property north and up-gradient of the Wilcox Site, where the Transcontinental/Ohio Refinery and associated facilities were located, for at least 20 years from 1922 or before. Transcontinental Oil Company became Marathon.

C.   **Background and Overview of Kinder Morgan Defendants**

15.   Defendant Kinder Morgan is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Houston, Texas. Kinder Morgan is the surviving and controlling entity, through name change, split, acquisition and/or merger, of predecessor entities,[8] which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs. As the surviving successor entity, Kinder Morgan has, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over its and its predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto.

16.   Defendant EPEC was a corporation organized under the laws of the State of Delaware. Upon information and belief, EPEC may be served by publication in the states where its former officers live. Upon information and belief, EPEC is or was a surviving

---

[8]   By way of example and not by limitation, the Wilcox Oil Company was an owner and conducted operations on the Wilcox Site from approximately February of 1921 through June of 1966. Wilcox became Tenneco, which became El Paso, which became Kinder Morgan. Plaintiffs hereby incorporate by reference the allegations in paragraphs 51-58. Specifically, Tenneco (both before and after its merger with El Paso) knew that contamination on the Wilcox Site was caused in part or in whole by its or its predecessors' operations and attempted to bury contaminants and/or dump them into the Sand Creek to fraudulently conceal the wrongdoing of Defendants.

and controlling entity, through split, acquisition and/or merger, of predecessor entities,[9] which owned or operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs. As the surviving successor entity, EPEC has, at all times through the history of the properties that are the subject of this litigation, exercised dominion and control over its and its predecessors' assets, actions and liabilities associated with the lands, facilities, and operations relevant hereto.

17.    Defendant EPE was created for the sole purpose of serving as a trustee for El Paso Corporation related liquidating trusts. EPE was effectively El Paso's legal department (and now Kinder Morgan's legal department) who served as trustee of the Trust and is now a subsidiary of Kinder Morgan. EPE is not registered to do business in Oklahoma and may be served through its last address known to Plaintiffs: 1001 Louisiana Street, Suite 1000, Houston, Texas 77002. Further, the Trust may be served through effective service on EPE. The Trust was created by EPEC upon the purported dissolution of EPEC in 1998. Among other things, the Trust/Trustee purports to have the power to prosecute, defend, and otherwise participate in, and take all actions necessary or useful in connection with, all actions, suits, and proceedings pending by or against or otherwise involving EPEC or the

---

[9]    By way of example and not by limitation, the Wilcox Oil Company was an owner and conducted operations on the Wilcox Site from approximately February of 1921 through June of 1966. Wilcox became Tenneco, which became El Paso, which became Kinder Morgan. In the mid-1960s, the Bolins acquired an ownership interest in the Wilcox Site and performed operations on parts of the site that caused and maintained contamination that adversely impacted Plaintiffs.

Trust after March 9, 2001. Further, the Trust purports to be a successor-in-interest to all assets of EPEC as of the effective date of the Trust and is effectively the alter ego of EPEC as a liquidating trust under applicable law.

18.     Defendant Tennessee Pipeline is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Houston, Texas. Upon information and belief, Tennessee Pipeline is not registered to do business in Oklahoma and may be served through its last address known to Plaintiffs: 1001 Louisiana Street, Suite 1000, Houston, Texas 77002. Upon information and belief, Tennessee Pipeline is a beneficiary of the Trust, and purports to be entitled to residual assets of the Trust. Kinder Morgan claims to own and control Tennessee Pipeline and to be entitled to receive the benefits of the Trust, including its assets. Further, upon information and belief, Tennessee Pipeline already received approximately $93,000,000 in accounts receivable from EPEC through Midwestern.

D.     **Background and Overview of Midwestern**

19.     Defendant Midwestern is a Delaware company with its principal place of business in Tulsa, Oklahoma. Midwestern may be served through its registered agent: National Registered Agents Inc., 1833 South Morgan Road, Oklahoma City, OK 73128. At the time of the events giving rise to Plaintiffs' claims against Midwestern,[10] but only

---

[10] At the time of the events giving rise to Plaintiffs' claims against Midwestern, Midwestern was owned and/or controlled by El Paso Corporation. In or about 2001, El Paso Corporation sold Midwestern to Northern Border Partners L.P ("Northern"). In or about 2006, Northern sold Midwestern to ONEOK, Inc. Midwestern continues to operate its business out of its headquarters and corporate office in Tulsa, Oklahoma.

recently disclosed to Plaintiffs, Midwestern was the sole shareholder of EPEC, and received payment of approximately $93,000,000 in accounts receivable shortly after EPEC learned of EPEC's potential liability for contamination of the Church property and other property. However, despite knowing that Plaintiffs (and others similarly situated to Plaintiffs) held claims against EPEC related to predecessor liability concerning the Wilcox Site, EPEC dissolved and transferred assets to Midwestern without any notice and without the knowledge of Plaintiffs and others of EPEC's existence, potential liability or dissolution. Under applicable Delaware and/or Oklahoma law, Midwestern is liable for all or part of the claims brought against EPEC because: (a) EPEC had actual knowledge of claims and obligations related to the Wilcox Site; (b) EPEC did not make reasonable provision to pay all obligations related to the Wilcox Site; and (c) EPEC nonetheless distributed its assets to Midwestern (the sole stockholder).

E.    Background and Overview of Bolin

20.    Bolin Oil Company, a Partnership, with partners Daniel Houston Bolin, Daniel Phillips Bolin, Robert Lee Bolin, and Charles William Bolin, is a partnership formed in Texas in 1948 with Texas resident partners. The Bolins owned and operated lands and/or facilities contributing harmful and hazardous contaminants that are now commingled with pollutants contributed by other Operational Defendants, all of which have injured and are continuing to injure Plaintiffs.

F.     **Background and Overview of Elias**

21.     Philip Elias is a resident of Creek County, State of Oklahoma, who owned or operated lands and/or facilities within the Wilcox site and adjacent to the Church property that contained pollutants originating from activities at the refineries and associated facilities on the Wilcox site and on the lands owned and operated by the Marathon Defendants north of the Wilcox site where the Transcontinental/Ohio refinery was located. Elias entered into a plan and agreement with the Kinder Morgan Defendants to make Elias's land appear more valuable and uncontaminated and for Kinder Morgan and Elias to hide contamination that they knew to exist on the Wilcox site in order to deceive others, including Plaintiffs, who might otherwise discover the contamination and warn potential victims of the pollution. Pursuant to that plan and agreement, Kinder Morgan (through Tenneco) agreed to, and did, unlawfully cut a berm containing contaminated liquids, allowing the contaminated liquids to flow into the Sand Creek, and bulldozed soils over the contaminated impoundment and surrounding areas to cover up and hide the solid contaminants and remaining liquids in the impoundment, as further described hereafter. Elias thereby acted in concert with Kinder Morgan to discharge, cover up, hide, and maintain the harmful and hazardous commingled pollutants contributed by all the Operational Defendants on the Wilcox Site and the Transcontinental/Ohio Site.

### G.    Operational Defendants' Activities at the Wilcox Site

22.    Operational Defendants are former operators of the oil refineries, tank farms, pipelines, lands, and related facilities at the "Wilcox Site".[11] Operational Defendants operated and maintained the Wilcox Site such that pollutants were discharged in large quantities to the soil, groundwater, and surface water, and maintained in the soils, groundwaters, and surface waters during the Operational Defendants' occupancy and after they abandoned the Wilcox Site without assuring their operations had not and would not affect the environment or the persons and property in the surrounding area. Operational Defendants created a nuisance that continues today and has adversely affected Plaintiffs. Operational Defendants unlawfully covered up and buried refinery products, crude oil, chemicals, and other contaminants. Operational Defendants acted intentionally and with malice towards the public and persons within the area surrounding the operations, and they engaged in conduct life-threatening to humans, including the individual Plaintiffs herein and others in the area. Additionally, Operational Defendants have sought to avoid and have fraudulently concealed liability for their wrongdoing by engaging in corporate shell-games, whereby they have formed straw corporations, transferred assets, attempted to transfer away obligations and liabilities by hiding, disguising, denying their involvement and liability for the wrongdoing in causing pollution to the subject lands and injury to Plaintiffs

---

[11] The Wilcox Site includes what is sometimes referred to as the Continental Refinery or the Lorraine Refinery because of the historical ownership of the refining facilities on the subject lands.

and others, and failing to timely and properly comply with mandatory disclosure requirements and discovery requests.

23.     The Wilcox Site contains several areas (including, among others, the North Tank Farm, Loading Dock, Lorraine Process Area, Wilcox Process Area, and East Tank Farm), and refinery-related operations took place on each area. In general, and not by way of limitation, Operational Defendants moved crude oil and products through pipelines and rail facilities on the site and stored crude oil and products on the North Tank Farm and East Tank Farm. Crude oil and chemicals were unloaded from rail cars, and products and other materials were loaded onto rail cars on the Loading Dock Area. The crude oil feedstock was processed in the Lorraine Process Area and Wilcox Process Area.



Figure 1:  DEQ map of the Wilcox Site.

24.     DEQ began mapping soil contamination on the Lorraine Process Area, Wilcox Process Area, and East Tank Farm, including the following:



**Figure 2:  DEQ map of contaminated soil at the Lorraine Process Area.**



**Figure 3:  DEQ map of contaminated soil on the middle of the East Tank Farm.**



**Figure 4: DEQ map of contaminated soil on the Wilcox Process Area and portion of the East Tank Farm.**

### H.     Marathon Defendants' Activities at the Transcontinental/Ohio Refinery

25.     In addition, the Marathon Defendants are former operators of the oil refineries, tank farms, pipelines, and related facilities approximately 1/4 mile north of the Church (the "Transcontinental Refinery"[12] and together with the Wilcox Site, the "Refineries").

---

[12]     The Transcontinental Refinery is sometimes referred to as the Ohio Refinery because The Ohio Oil Company (which later became Marathon Oil Company by a name change to the Trademark "Marathon" that was owned by Transcontinental) purchased Transcontinental Oil Company, the owner of the Transcontinental Refinery.



**Figure 5: DEQ map demonstrating proximity of the Refineries.**

26.   Marathon Defendants operated the Transcontinental Refinery such that pollutants were discharged in large quantities to the soil, groundwater, and surface water, creating a continuing nuisance, and then abandoned the Transcontinental Refinery without assuring their operations had not and would not affect the environment or the persons and property in the surrounding area. Upon information and belief, Marathon Defendants unlawfully covered up and buried refinery products, crude oil, chemicals, and other contaminants. Further, contamination from the Transcontinental Refinery has migrated down-gradient onto and under the Wilcox Site and the Church Property, and has also become commingled with contamination from the Wilcox Site. Marathon Defendants acted intentionally and with malice towards the public and persons within the area surrounding the operations, and they engaged in conduct life-threatening to humans, including the individual Plaintiffs herein and others in the area.



**Figure 6: DEQ map demonstrating downgradient migration of pollution and contaminants from Transcontinental Refinery and "Ponds" to Wilcox Site.**

27.    Contamination from the Transcontinental Refinery flows down-gradient onto the Wilcox Site through surface water runoff and groundwater flow. By way of example, and not by way of limitation, contamination flows into a tributary that runs from the Transcontinental Refinery into and through the Wilcox Site. Among other things a DEQ employee familiar with the Transcontinental Refinery has testified under oath that:  (a) contamination from the Transcontinental Refinery has influenced sample results on the Wilcox Site showing pollution; (b) waste on the Transcontinental Refinery is or was unconfined and can migrate off site via either surface water or groundwater pathways; (c) runoff from the Transcontinental Refinery runs south toward and onto the Wilcox Site; and (d) the Sand Creek (located southwest of the Wilcox Site) receives "suspected contaminated runoff from" the Transcontinental Refinery.

I.    **Operational Defendants' Activities Caused Massive, Latent Pollution**

28.    Operational Defendants had duties to Plaintiffs by virtue of their positions as owners of the land and as owners and/or operators of the Refineries, tank farms, and related facilities and under the laws, rules, and regulations of the State of Oklahoma and the United States.  These duties include, *inter alia*:  (a) to refrain from placing their interests above those of Plaintiffs; (b) to disclose all information to Plaintiffs which would have a material impact upon Plaintiffs' interests; (c) to protect the surface estate from any damage by their operations; (d) to refrain from unlawful acts; (e) to not pollute; (f) to warn Plaintiffs of any risk of harm or danger to persons or property caused by their operations; (g) to immediately remove any condition caused by such operations which is dangerous, harmful or damaging to persons or property; (h) to not profit to the detriment of Plaintiffs' interests (including the decrease of expenses by failing to properly conduct operations and remedy the damages); and (i) to comply with statutes, rules, regulations and common law in the operation of their businesses.

29.    Operational Defendants were and are under a duty to prevent the contamination, injury, waste, and destruction of the Church Property, and damages to Plaintiffs, by conducting operations so as to prevent such occurrences and immediately remediate any contamination or injury that occurs. Oil refineries are known to release harmful contaminants into the environment, even in circumstances where the operators of the refineries are exercising due care.  As a result, Defendants had a further duty to warn Plaintiffs of any risk of harm or danger to persons or property caused by Operational Defendants' operations, to abate the dangerous conditions and continuing nuisances which

they have created, to maintain their properties so as to prevent further damage, to prevent harmful materials from escaping the property onto the Church Property or other property, and to remove any such material from the Church Property or the property of others.

30.    While acting as operators of the Refineries and thereafter, Operational Defendants caused or allowed oil refinery feedstock, products, and other harmful chemicals to be maintained in such a way as to cause severe pollution and contamination to the surface and subsurface soil and water on the Church Property, as well as on adjoining lands, and have created a condition dangerous to the health and safety of Plaintiffs, the Church staff, Church parishioners, and others. Specifically, Operational Defendants knew or should have known that deleterious substances from the Refineries, tank farms, pipelines, and related facilities were flowing on, over, across, and through the soils, surface waters, and aquifers on Church lands and adjoining lands, and causing pollution and a high risk of further pollution to the Church property and other adjoining properties.

31.    Despite this knowledge, Operational Defendants: (a) allowed deleterious substances to flow upon the surface and underground and to seep into the subsurface of Church Property and adjoining lands by operating the Refineries, tank farms, pipelines, and related facilities, by failing to remove deleterious substances, by operating leaking above-ground and underground pipelines and tanks for the handling of deleterious substances, by disposing of pollutants onto the surface and into creeks and ponds, by improperly maintaining and operating the facilities, by failing to clean up deleterious substance spills that have occurred from their various facilities, and by causing and permitting severe contamination of the land and groundwater; and (b) concealed, covered

up, and failed to disclose such conditions and events to Plaintiffs, and failed to warn Plaintiffs of the danger to groundwater, animals, persons, and property arising therefrom. These nuisances arose from the unlawful acts and omissions of duty by the Operational Defendants, whereby they conducted their operations in a manner that polluted the lands and waters of the State of Oklahoma, including the Church Property, and endangered the comfort, repose, health, and safety of Plaintiffs and others or otherwise annoyed and injured them, including rendering Plaintiffs insecure in life, health, and the use of property. The Environmental Protection Agency and the Oklahoma Department of Environmental Quality are engaged in an ongoing investigation of the polluted properties and have confirmed the presence of large quantities of pollution from operations of the Refineries and associated facilities and lands.



Figure 7: EPA figure, mapping fluorescence in and around the Wilcox Site.

32.    The actions of Operational Defendants have created a health hazard to Plaintiffs and the Church parishioners and staff.



The Rev. Word Evans holds an oil-soaked length of twine he had dropped down the 190-foot well that once provided drinking water for his church's congregation in Bristow. MICHAEL WYKE Tulsa World

**Figure 8:** *Tulsa World* **picture showing oil from capped church drinking water well.**

33.     The amount sought as damages exceeds the dollar requirement for diversity jurisdiction under 28 USCA §1332; however, diversity jurisdiction does not exist in this case because the requirement for complete diversity between the parties is not present.

## I.     Defendants Attempt to Escape Liability

34.     Some or all of the Operational Defendants have engaged in a series of corporate mergers, transactions, cover-ups, and shell-games designed to obfuscate liability for contamination at the Refineries and related facilities, to hold assets related to the former operators of the Refineries and related facilities, and to foist liability for the Refineries and related facility contamination on companies with insufficient or no assets to cover the past, present, and future liabilities. Together, these actions and transactions (which were designed to evade existing obligations to clean up the lands affected by the Refineries, to

shroud the identity of the parties responsible for cleanup, and to avoid damages) form a basis of the alleged fraud, deceit, fraudulent transactions, fraudulent concealment, sham transactions, and alter ego relationships set forth herein. Accordingly, and to the extent necessary, Plaintiffs seek to disregard the legal fictions created by some or all Operational Defendants, in order to protect the interests of the public, to circumvent fraud, to protect the rights of third persons, and to accomplish justice.

35.   By way of example, and not by way of limitation, in-house counsel for BP has testified under oath that BP controls and operates its worldwide business utilizing organization by corporate function across the entire world-wide BP "Group" without regard to individual entity existence (*i.e.*, function over form), that he is unsure whether all BP Defendants attempt to make a profit, that he uses letterhead from one BP Defendant when representing purportedly separate BP entities, that certain BP entities may perform functions for other BP entities without compensation, and that he does not know whether he has authority to represent BP, p.l.c. on a stand-alone basis. This testimony evidences the very types of corporate shell games that: (i) show alter-ego and common control, (ii) present actionable conduct and liability by each of the BP Defendants, and (iii) allow piercing of the corporate veil.

36.   By way of further example, and not by way of limitation, and upon information and belief, in or around 1994 EPEC was notified by government representatives of possible pollution related to the Wilcox Site. Shortly after learning of its potential liability for the Wilcox Site, EPEC (a subsidiary of El Paso Energy Corporation) purported to transfer its accounts receivable (amounting to approximately $93 million) to

Midwestern (EPEC's sole shareholder and, at the time, a subsidiary of El Paso Energy Corporation), and Midwestern, in turn, purported to transfer the accounts receivable to Tennessee Pipeline (another subsidiary of El Paso Energy Corporation).  EPEC then created the Trust to hold its remaining assets and liabilities, including those related to the Wilcox Site, with EPE (yet another El Paso Energy Corporation subsidiary — this one created for the sole purpose of serving as trustee) serving as trustee, and with the Tennessee Pipeline (again, an El Paso Energy Corporation subsidiary) being named as the sole beneficiary of any remainder trust assets.

37.    Then, allegedly unburdened and denuded of all its assets, EPEC attempted to dissolve in order to eliminate its liabilities. However, EPEC's attempted dissolution was ineffective to resolve existing and future liabilities against EPEC and its directors, governing persons, and stockholders because, upon information and belief, EPEC failed to mail a copy of a notice of dissolution or otherwise give actual notice to each known claimant of the corporation (including, but not limited to, persons known by EPEC to be affected by pollution in the Bristow, Oklahoma, area) or pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional, or unmatured contractual claims known to EPEC.

38.   By way of further example, and not by way of limitation, Marathon Defendants have structured their companies and made conveyances so that (upon information and belief) Marathon Oil Company purportedly "holds" all of the company assets for Marathon Oil Corporation and so that (upon information and belief) Marathon

Petroleum Company LP purported "holds" all of the company assets for Marathon Petroleum Corporation, in part to attempt to shield the Marathon Defendants from liability.

## FIRST CLAIM FOR RELIEF
### (NEGLIGENCE)

39.    Operational Defendants breached the duty of ordinary care or skill in the management of property and/or person.  By way of example, and not by way of limitation, Operational Defendants operated the Refineries and associated facilities (including storage tanks, pipelines, loading areas, stilling ponds, etc.) in a manner by which harmful and hazardous contaminants were released into nearby soil, surface water, and groundwater and allowed to migrate to more distant locations. Further, Operational Defendants were negligent in failing to act when the circumstances required action. By way of example, and not by way of limitation, Operational Defendants knew that their operations on the Refineries and associated facilities (including storage tanks, pipelines, loading areas, stilling ponds, etc.) caused pollution to the land on which the Refineries and associated facilities are situated and/or affect (the "Land") and that persons (including Plaintiffs) were living on portions of the Land; yet, Defendants nonetheless failed to clean up the pollution, or even warn occupants of the pollution, all of which caused a direct threat to the lives, health and well-being of Plaintiffs and the users of the Land.

40.    More specifically, Operational Defendants negligently performed their operations with respect to the Refineries, tank farms, pipelines, and related facilities, as aforementioned and in other particulars known by Operational Defendants and as yet unknown fully to Plaintiffs, and thereby have allowed deleterious substances to pollute the

Church Property and other land and waters. Operational Defendants are under a duty to perform operations so as not to cause pollution. Operational Defendants are also under a duty to not discard or abandon equipment, trash and debris on or under the land. Defendants are also under a duty to clean up the pollution, abandoned equipment, debris, trash and other harmful materials on or under the land, caused by Operational Defendants, which were latent and their impact unknown to Plaintiffs until less than two years prior to the filing of this *Petition*, and all of which have constituted a continuing nuisance that still exists on the Church Property and on adjacent lands. Defendants have breached their duties, and Plaintiffs have been injured as a result thereof.

41.     Operational Defendants acted in gross disregard for the rights of Plaintiffs and others in conducting their operations and improperly maintaining harmful and hazardous conditions on the lands, which infiltrated into and/or migrated onto the Church Property and the land of others, including actions and inactions which were in violation of statutes and the rules and regulations of regulatory bodies designed to protect the subject private lands as well as the public welfare. The actions of Operational Defendants as alleged herein indicate the absence of even slight care on the part of Operational Defendants to perform their duties to Plaintiffs and others and thereby constitute gross negligence on the part of Operational Defendants.

42.     Further, the instrumentality causing Plaintiffs' injuries was under the exclusive control of Operational Defendants; the pollution of soils and waters on Church property and adjoining properties ordinarily would not occur in the operation of the Refineries, tank farms, and associated facilities absent some negligence on the part of the

operators, despite the fact that pollution can occur even when due care has been fully exercised in the operation of the Refineries, tank farms, and associated facilities; Operational Defendants have superior knowledge of the facts concerning the cause of Plaintiffs' injuries; and Plaintiffs, therefore, specifically plead the doctrine of *res ipsa loquitur* as fixing the liability of Operational Defendants for negligence in the operation of the Refineries and the consequent damages to Plaintiffs.

43. Moreover, in breaching their duty of care, Operational Defendants have violated statutes, rules and regulations, and Plaintiffs specifically plead the theory of *negligence per se*. Plaintiffs allege Defendants' violation of the following Oklahoma statutes, together with the rules and regulations promulgated pursuant thereto:

(i)   27A Okla. Stat. §2-6-101 *et seq.*, (Oklahoma Water Quality Act);

(ii)   50 Okla. Stat. §§1-3, 5-8, 10, 13 (Nuisances);

(iii)   27A Okla. Stat. §2-10-101 *et seq.*, (Oklahoma Solid Waste Management Act).

44. By way of example, and not as a limitation, Operational Defendants have discharged or caused the discharge of (without a permit) significant amounts of pollutants on or in the vicinity of the Church Property, and have further left these pollutants in place despite knowing the location and character of the pollutants. Over time, the pollutants have seeped from point sources (including, but not limited to, loading facilities, tank bottoms, pipelines, processing facilities) into the soil, groundwater, and surface waters, and have discharged into both jurisdictional waters and groundwater aquifers (including groundwater aquifers underlying the Church Property, groundwater aquifers used as

drinking water sources, wetlands on or near the Church Property, and navigable waters on or near the Church Property). Further, the groundwater aquifers at issue in turn discharge into jurisdictional waters, including, but not limited to, the Sand Creek.



Figure 9: DEQ picture of oil seeps in Sand Creek.

45.     In addition, pollutants discharged into wetlands, navigable waters, and groundwater aquifers have come into contact with Plaintiffs' persons, despite the fact that the Oklahoma Water Quality Act prohibits the unpermitted discharge of pollutants into such water sources and despite the fact that the Oklahoma Water Quality Act was intended, in part, to minimize or prevent the transmission of pollutants through waters subject to the jurisdiction of the Oklahoma Water Quality Act.



**Figure 10:  EPA map showing proximity of jurisdictional waters to Wilcox Site.**

46.     Further, upon information and belief (and as discussed in greater detail above

and below), the waste buried by Tenneco (in concert with Elias) constituted solid and/or

hazardous waste as defined by Oklahoma law, and burying such waste (as described in

more detail above and below) violates the Oklahoma Solid Waste Management Act and/or

Oklahoma regulations applicable to solid and/or hazardous waste. By way of example, and

not by way of limitation, portions of the pollution caused by the Refineries constitutes solid

waste as defined in 27A Okla. Stat. §2-10-103(20).  And, by burying the waste on the

Wilcox Site, Tenneco (in concert with Elias) disposed of the solid waste at a site or facility

for which a permit for solid or hazardous waste disposal was not issued by DEQ, in violation of 27A Okla. Stat. §2-10-301.

47.     Plaintiffs seek recovery of all damages to their persons, including personal harm, personal annoyance and inconvenience, endangerment of comfort, health, tranquility and safety, and for Plaintiffs having been rendered insecure in their lives, health and use of the Church, the Land and the parsonage. Further, as a direct result of Operational Defendants' gross negligence and reckless disregard for the rights of Plaintiffs, Plaintiffs are entitled to punitive damages to punish Operational Defendants for their actions and to deter others similarly situated from acting in a like manner.

**SECOND CLAIM FOR RELIEF**
**(PUBLIC NUISANCE)**

48.     Because Operational Defendants' operations have polluted the waters of the State of Oklahoma, the pollution is, under 27A Okla. Stat. §2-6-105(A) and other law, a public nuisance. All Oklahomans have an interest in conserving the waters of the state and protecting, maintaining and improving the quality of waters of Oklahoma for public water supplies, for the propagation of wildlife, fish and aquatic life and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses as described in 27A Okla. Stat. §2-6-102. Thus, pollution of the waters of the State of Oklahoma injures the entire population of the State of Oklahoma. Therefore, this pollution of the waters of the state affects at the same time a considerable number of people. The extent of the annoyance or damage inflicted upon each individual is unequal. Plaintiffs were specifically injured by the pollution because they lived where the land and water have been polluted and/or were

exposed to polluted land and water. The pollution caused by Operational Defendants also affects adjoining property owners and tenants and other persons and property downgradient of the Refineries. The nuisance created and continued by Operational Defendants is a continuing public nuisance. Plaintiffs seek recovery of all damages and injuries caused by Operational Defendants to Plaintiffs' persons, including personal harm, personal annoyance and inconvenience, endangerment of comfort, health, tranquility and safety, and for Plaintiffs having been rendered insecure in their lives, health and use of the Church, the Land, and the parsonage. Further, Plaintiffs are entitled to punitive damages to punish Operational Defendants for their actions and to deter others similarly situated from acting in a like manner.

### THIRD CLAIM FOR RELIEF
### (PRIVATE NUISANCE)

49.     The pollution caused to the Church Property and parsonage also constituted and constitutes a private nuisance. Plaintiffs and the Church parishioners and staff members have been harmed, annoyed, and inconvenienced by the nuisance created by Operational Defendants. The continuing nuisance created, hidden, and maintained by Operational Defendants has caused damage to Plaintiffs.

### FOURTH CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

50.     Based on information and belief, Operational Defendants have saved money by failing to prevent pollution, remediate pollution, and prevent its spread and adverse effects, all to the detriment of Plaintiffs. Operational Defendants are under an obligation to

follow rules and laws that require them to prevent, abate and remediate pollution. Operational Defendants have breached their duty to Plaintiffs and, as a result thereof, have been unjustly enriched. Plaintiffs are entitled to recover damages measured by the benefits received by Operational Defendants as a result of Operational Defendants' wrongful actions, including, but not limited to, the money saved by Operational Defendants through their non-compliance with statutory, regulatory, and common law duties.

FIFTH CLAIM FOR RELIEF<br>(STRICT LIABILITY)

51.     Operational Defendants are strictly liable to Plaintiffs for all damages caused by Operational Defendants' actions and inactions, which were in violation of Oklahoma statutes and/or the rules and regulations of Oklahoma regulatory bodies or in the operation of non-exempt hazardous activities. The substances on the properties are highly dangerous substances, many of which are known carcinogens or cause heavy-metal (*e.g.,* lead) or other toxicity to humans and animals. The substances also have a high risk of harming the water, soils, wildlife, persons, structures, personal property, and beneficial uses on the land. The likelihood that harm would result from the Operational Defendants' activities was great, and that harm did, in fact, occur and created a Superfund site. The exercise of reasonable care in the operation of the facilities may reduce, but cannot eliminate, the risk

of harm.[13] Refining and related activities such as those conducted by the Operational

Defendants in this case is not a matter of common usage in Oklahoma, as is evident from

the fact that only approximately four (4) refineries are currently operated in this state and

only approximately 140 refineries are currently operated in the entire United States (with

many states having no refineries). The refining and associated facilities were located in an

inappropriate position in an environmentally-sensitive area, where the activities caused

pollution to migrate downhill, downstream and downgradient, which allowed

contamination of a much larger area than would otherwise have been affected. The danger

of the pollution and its impact on life and property greatly outweighed any value to the

community where the facilities were located.

**SIXTH CLAIM FOR RELIEF**
**(FRAUD/DECEIT -- COVER UP AND DUMPING)**

52.     Operational Defendants operated the Refineries and associated facilities in a

manner that resulted in unlawful pollution and contamination of the operated properties

and adjacent properties, including the Church Property. The unlawful operations were

conducted knowingly and without regard for the consequences to the environment or

---

[13]     The American Petroleum Institute (API) conducted an analysis of U.S. oil spillage and determined that, in the decade between 1988 to 1997, average annual refinery oil spillage was 15,015 barrels, and in the decade 1998 to 2007, that annual average was 12,136 barrels, reflecting a high risk of releases, even in highly-controlled eras, where governmental oversight and modern leak prevention requirements are routinely employed, unlike in the days of operation of the Refineries and associated storage operations in Bristow, Oklahoma, during the first half of the twentieth century.

http://www.api.org/oil-and-natural-gas/environment/clean-water/oil-spill-prevention-and-response/%7E/media/93371EDFB94C4B4D9C6BBC766F0C4A40.ashx

persons who would be harmed, including Plaintiffs, property owners, land occupiers, guests and others. Operational Defendants misrepresented their activities as being lawful and in compliance with laws, rules and regulations, knowing that the activities were unlawful and violated laws, rules and regulations and were harmful to the environment and to persons and property that would come in contact with the contamination and pollution.

53.     During the times they operated and/or owned the Refineries and associated facilities, and thereafter (with the continuing nuisance that they created, that existed, and that continues to exist), Operational Defendants had a duty of full disclosure of the pollution they had created on the property. Plaintiffs do not know what affirmative representations were made by the Operational Defendants with respect to the contamination they created, other than their denials that Plaintiffs recently learned of; however, the Operational Defendants intentionally withheld vital information, failed to fully and adequately disclose the existence, extent, danger, risk and pervasiveness of the pollution and contamination of the property, covered up and concealed the pollution and contamination and their knowledge of the dangerous conditions, and conveyed the property to the Church's predecessors without full disclosure, knowing the polluted, contaminated and dangerous condition of the property and actively concealing that information, reasonably expecting that their purchasers, future purchasers and other persons would rely upon the deception and fraud of the Operational Defendants and be damaged in that reliance.

54.    By way of example, and not by way of limitation, on March 18, 1998, Tom

Beer of Ecology and Environment, Inc. (a contractor for the U.S. Environmental Protection

Agency) reported to his company and the EPA that Tenneco Oil Company used heavy

equipment and equipment operators to cover oily waste at the ground surface and within

tank berms with clean soil. By moving clean soil over contaminated soil, Tenneco Oil

Company (a predecessor-in-interest to Kinder Morgan), in concert with Elias, quite literally

buried, covered up, and illegally dumped its contamination and that of its predecessor

companies to fraudulently conceal the wrongdoing of Defendants.



Figure 11:  DEQ map demonstrating Pond 2.

55.    By way of further example, and not by way of limitation, Tenneco (in concert

with Elias) used bulldozers or other heavy equipment to cut the berm retaining the

hazardous waste in Pond 2 with the express purpose of draining the hazardous waste in

Pond 2 into the Sand Creek. Upon information and belief, the cut berm in Pond 2 allowed

hazardous waste and contaminants to flow from Pond 2 to the Sand Creek over a period of several years. Cutting the berm of Pond 2 to discharge contaminants into the Sand Creek was the functional equivalent of illegally dumping waste directly into the Sand Creek.



Figure 12: Agency map showing cut berm and probable point of entry into Sand Creek.

56.     Tenneco's scheme to hide the oily waste by covering it with clean soil and to dump hazardous waste into the Sand Creek, with Elias's agreement, were acts fitted to deceive future purchasers and land occupiers of the property under 15 Okla. Stat. §58. Specifically, Tenneco (in concert with Elias) intended to deceive future purchasers and land occupiers into thinking that contamination on the Wilcox Site either did not exist at all, or, if the contamination was to be discovered, that it existed to a lesser extent that it does in reality.

57.     Moreover, pursuant to 76 Okla. Stat. §2, the Kinder Morgan Defendants (as successors to Tenneco) are liable for willful deceit, because they intended to induce claimants, future buyers, and others to alter their position to their detriment. Among other reasons, the actions of Tenneco (in concert with Elias) amount to willful deceit because of the injury or risk presented to claimants, future buyers, and others, including personal injury through exposure to contaminants and damage to property values when the buried contamination was eventually uncovered and brought to light. Tenneco and Elias were required to disclose the existence of the buried waste, both because they knew or should have known the waste was harmful to human health, property rights, and the environment, and because the act of illegally burying or discharging the waste gave rise to an additional duty to disclose. Plaintiffs, the Church and other property owners and land occupiers on the Wilcox site are of the particular class of persons whom Tenneco and Elias intended to deceive.

58.     All of these actions and inactions by the Operational Defendants were willful, wanton, malicious, oppressive, deceitful, misleading, grossly negligent and constitute actual fraud, constructive fraud, misrepresentation, and/or deceit under Oklahoma law.

59.     For the same reasons, the actions of Tenneco and those acting in concert with it give rise to civil conspiracy. Specifically, Tenneco entered into an unlawful agreement in an attempt to hide the waste by burying it or discharging it, committed one or more

unlawful acts by burying the waste and discharging the contaminants in Pond 2 into the Sand Creek (including, but not limited to, violating Oklahoma's solid waste and hazardous waste statutory and regulatory provisions), and the Plaintiffs and others were damaged as a result. Among other reasons, the Plaintiffs were damaged because waste buried by Tenneco (in concert with Elias) has become commingled with other legacy waste created by the Refineries, which moves in a generally south direction over Church land and into the Sand Creek. Plaintiffs seek recovery of all damages and injuries caused by Operational Defendants to Plaintiffs' property and persons, including personal harm, personal annoyance and inconvenience, endangerment of comfort, health, tranquility and safety, and for Plaintiffs having been rendered insecure in their lives, health and use of the Church Property. Further, Plaintiffs are entitled to punitive damages to punish Operational Defendants for their actions and to deter others similarly situated from acting in a like manner.

### SEVENTH CLAIM FOR RELIEF
### (FRAUDULENT TRANSFER AND CONSPIRACY – EPEC TRUST)

60.    EPEC, Tennessee, the Trust, and EPE (and their successor, Kinder Morgan), and Midwestern are also liable for fraudulent transfer. Specifically, upon notice that DEQ was investigating pollution at the Wilcox Site, EPEC attempted to dissolve and distribute all assets to affiliate and subsidiary companies while retaining all liability for the Wilcox Site (as an entity without assets). To achieve this goal, EPEC, Tennessee, the Trust,

Midwestern, and EPE engaged in a multi-level, conspiratorial scheme of constructive fraud.

61.     On or about December 18, 1998, EPEC (an El Paso Energy Corp. subsidiary) filed a certification of dissolution.

62.     Upon information and belief, EPEC never gave landowners or any residents living on the Wilcox Site (or any other persons in the Bristow, Oklahoma, area) notice of dissolution or the right to make claims regarding pollution from the Refineries.

63.     Upon or near dissolution, EPEC made a fraudulent mass transfer of its remaining assets (approximately $93,000,000 in accounts receivable) to Midwestern, the sole shareholder of EPEC at that time.

64.     Midwestern then fraudulently transferred those accounts receivable to Tennessee (another El Paso Energy Corp. subsidiary).

65.     On or about March 9, 2001, approximately three years after filing the certification of dissolution, long after all the Defendants had been contacted regarding their liability for the pollution at the Refineries, and years after Tenneco's fraudulent cover-up activities, EPEC created the Trust and placed its remaining assets in the Trust, with EPE (another El Paso Energy Corp. subsidiary) as trustee and Tennessee as beneficiary.



**Figure 13: How El Paso entities moved assets from one affiliate to another.**

66.     The transfers from EPEC to Midwestern and the Trust were transfers fraudulent to creditors within the meaning of 24 Okla. Stat. §116 because EPEC made the transfers either with actual intent to hinder, delay, or defraud those harmed by the contamination or without receiving a reasonable equivalent value in exchange for the transfer. Further Midwestern and EPE (as trustee) did not accept the transfer of assets from EPEC in good faith and for a reasonably equivalent value. Kinder Morgan has ratified the actions of its predecessors and has sought to retain the benefits derived from the wrongful actions and inactions.

67.     Plaintiffs expressly seek:  (a) a determination that the scheme was fraudulent and conspiratorial; (b) avoidance of the transfer or obligation to the extent necessary to satisfy their creditor claims; (c) attachment or other provisional remedy against the assets

transferred or other property of the transferees as provided by law; and (d) any other relief

the circumstances may require including any relief sought herein under other claims for

relief, whether legal or equitable, actual or punitive, statutory or common law.

### EIGHTH CLAIM FOR RELIEF
### (FEES AND COSTS)

68.     Plaintiffs are incurring attorneys' fees and costs because of Defendants'

negligent and/or willful injury to Church property on which Plaintiffs resided and had

property rights. Plaintiffs seek recovery of such attorney's fees and costs.

**WHEREFORE**, premises considered, Plaintiffs pray judgment against Defendants

for relief, as described above, for actual and punitive damages to be proven at trial on the

alternative theories described above, and any other theory supported by the facts and

allowed by law or equity. In addition, Plaintiffs request the award of attorneys' fees,

interest, the cost of this litigation and such other just and equitable relief as the Court may

deem proper.

Respectfully submitted,

Michael J. Blaschke, OBA# 868
Michael J. Blaschke P.C.
Landmark Towers West, Suite 1000
3555 N.W. 58th Street
Oklahoma City, OK 73112
Phone: (405) 562-7771
Fax:     (405) 285-9350
mblaschke@thelawgroupokc.com

Allan DeVore, OBA# 2328
Jandra Susanne Cox, OBA #16610
DeVore Law Firm, PLC
5709 NW 132nd Street
Oklahoma City, OK 73142
Phone: (405) 603-8585
allan@devorelawok.com
jandra@devorelawok.com

James Key, *Pending Pro Hac Vice*
TX 24012958
Michael K. Reer, *Pending Pro Hac Vice*
OBA# 34074
HARRIS, FINLEY & BOGLE, P.C.
777 Main Street, Suite 1800
Fort Worth, Texas 76102
Phone: (817) 870-8700
Fax:    (817) 332-6121
Jkey@hfblaw.com
Mreer@hfblaw.com

**ATTORNEYS FOR PLAINTIFFS**

**JURY TRIAL DEMANDED**

**ATTORNEYS' LIEN CLAIMED**