## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Johnny Dale Floyd; Virginia Floyd; Jennifer Gail Robinson; Lorena Ann Goforth; and Joanna Paul, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 21-cv-00132-CVE-CDL |
| BP p.l.c.; Atlantic Richfield Company; BP Corporation North America Inc.; BP America Inc.; BP Pipelines (North America) Inc.; Marathon Oil Corporation; Marathon Oil Company; Marathon Petroleum Corporation; Marathon Petroleum Company LP; Kinder Morgan, Inc.; EPEC Oil Company Liquidating Trust; El Paso Tennessee Pipeline Co., L.L.C.; El Paso Energy, E.S.T. Co.; EPEC Oil Company; Midwestern Gas Transmission Co.; Bolin Oil Company, a Partnership, its partners, Daniel Houston Bolin, Daniel Phillips Bolin, Robert Lee Bolin, Charles William Bolin, and the successors of the Bolins; and Philip Elias, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | (Improperly removed from the District Court of Creek County, Bristow Division, Case No. BCJ-2020-00025) |
| Defendants. | ) | |

## PLAINTIFFS' MOTION TO REMAND

Michael J. Blaschke, OBA No. 868
Michael J. Blaschke, P.C.
Landmark Towers West, Suite 1000
3555 N.W. 58th Street
Oklahoma City, OK 73112
Phone: (405) 562-7771
Fax:   (405) 285-9350
mblaschke@thelawgroupokc.com

Allan DeVore, OBA No. 2328
Jandra Cox, OBA No.16610
DeVore Law Firm, PLC
5709 N.W. 132nd Street
Oklahoma City, OK 73142
Telephone: (405) 603-8585
dlf@devorelawok.com

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

    *A.  Synopsis of the Floyd Family's Claims* . . . . . . . . . . . . . . . . . . . . .    1
    *B.  Non-Diversity of Parties*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2
    *C.  The Allegations Against Elias in the Floyd Family's Petition*    3
    *D.  The Allegations Against Midwestern in the Floyd Family's*
        *Petition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    *E.  Kinder Morgan's Wrongful Removal* . . . . . . . . . . . . . . . . . . . . . .    10

II.   REMOVAL STATUTES ARE STRICTLY CONSTRUED AGAINST
    REMOVAL, AND THE BURDEN OF PROOF IS ON THE PARTY
    SEEKING TO REMOVE THE CASE . . . . . . . . . . . . . . . . . . . . . . . .    10

III.  MIDWESTERN AND ELIAS WERE PROPERLY JOINED AS PARTY
    DEFENDANTS BECAUSE OF THEIR OVERT ACTIONS IN
    FURTHERANCE OF THE CONSPIRACY TO FRAUDULENTLY
    COVER UP AND HIDE THE CONTAMINATION AND ASSETS    11

    *A.  Fraudulent Joinder Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11
    *B.  Heavy Burden of Proving Fraudulent/Improper Joinder* . . . . . . .    12
    *C.  Liberal Construction of Pleadings* . . . . . . . . . . . . . . . . . . . . . . . .    14
        *(i)     Debtor-Creditor Status and Shareholder Liability* . . .    15
        *(ii)    Insufficient Pleading* . . . . . . . . . . . . . . . . . . . . . . . . . .    16
        *(iii)   Statute of Limitations* . . . . . . . . . . . . . . . . . . . . . . . . .    17

IV.   AS A PARTICIPANT IN A CIVIL CONSPIRACY, IT IS
    IRRELEVANT THAT ACTIONS TAKEN BY ELIAS OCCURRED
    AFTER THE FLOYD FAMILY'S TENURE ON THE LAND . . . .    19

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

i

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page**

*Aughey v. Windrem*, 114 N.W. 1047 (1908) . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Auto. Consulting Res., Inc. v. Interstate Nat'l Dealer Servs., Inc.*,
No. 17-CV-225-JED-FHM, 2020 WL 6994213 (N.D. Okla. Oct. 8, 2020)   17

*Barsh v. Mullins*, 1959 OK 2, 338 P.2d 845 . . . . . . . . . . . . . . . . . . . . . . . .   20

*Batoff v. State Farm Ins. Co.*, 977 F.2d 848 (3rd Cir. 1992). . . . . . . . . . . . . .   13

*Blasdel v. Gower*, 173 P. 644 (Okla. 1918) . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Bohanan v. Atchison, Topeka and Santa Fe Railway Co.*, 289 F.Supp. 490
(W.D. Okla. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Calderon v. Kan. Dep't of Soc. And Rehab. Servs.*, 181 F.3d 1180
(10th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Chapparo v. Tu*, 2007 WL 2948669 (W.D. Okla. 2007) . . . . . . . . . . . . . . .   14

*Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So.2d 1157
(Fla. 3d DCA 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 23

*Chavez v. Kincaid*, 15 F.Supp. 1118 (D.N.M. 1998) . . . . . . . . . . . . . . . . . .   11

*de Vries v. Brumback*, 349 P.2d 532 (1960) . . . . . . . . . . . . . . . . . . . . . . . .   23

*Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834 (Okla. 2001)   18

*Douglass v. Park City Assoc.*, 331 F.Supp. 823 (E.D. Penn. 1971). . . . . .   11

*Fajen v. Foundation Reserve Ins. Co., Inc.*, 683 F.2d 331 (10th Cir. 1982)   10

*Favila v. Katten Muchin Rosenman LLP*, 188 Cal.App.4th (2010) . . . . . .   23

*Gaylord Entertainment Co. v. Thompson*, 1998 OK 30, 958 P.2d 128 . . .   19, 20

*Gens v. Casady School*, 2008 OK 5, 177 P.3d 565 . . . . . . . . . . . . . . . . . .   14

*Green v. Amerada Hess Corp.*, 707 F.2d 201, 207 (5th Cir.1983) . . . . . .   13

*Griffin v. Indep. Sch. Dist. No. 1 of Tulsa Cnty., Okla.*,
No. 13-CV-0702-CVE-FHM, 2014 WL 585433 (N.D. Okla. Feb. 13, 2014)     18

*Hames v. Bayer AG*, 2004 WL 5363840 (W.D. Okla. 2004) . . . . . . . . . . .     14

*Hart v. Wendling*, 505 F.Supp. 52 (W.D. Okla. 1980) . . . . . . . . . . . . . . . .     12

*Hawk v. Perillo*, 642 F.Supp. 380, 387 (N.D. Ill.1985) . . . . . . . . . . . . . . .     23

*Honeywell v. GADA Builders, Inc.*, 2012 OK CIV APP 11,
271 P.3d 88 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14

*Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336
(9th Cir.1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

*In re Home-Stake Prod. Co. Sec. Litig.*, 76 F.R.D. 351 (N.D. Okla. 1977)     21

*In re Nissan Motor Corp. Antitrust Litig.*, 430 F.Supp. 231 (S.D.N.Y.1977)     22

*In re U.S. Oil and Gas Litigation*, 1988 WL 28544 (S.D. Fla.) . . . . . . . . .     23

*Koch v. Royal Wine Merchants, Ltd.*, 907 F.Supp.2d 1332 (S.D. Fla. 2012)     22

*McCurtain County Prod. Corp. v. Cowett*, 482 F.Supp. 809
(E.D. Okla. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11

*McFarland v. McFarland*, 684 F.Supp.2d 1073, 1085 (N.D. Iowa 2010)     23

*Montano v. Allstate Indemnity*, 211 F.3d 1278, 2000 WL 525592
(10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13, 16

*Moseley v. Wyeth*, 2002 WL 32991341 (W.D. Okla. 2002) . . . . . . . . . . .     14

*Myzel v. Fields*, 386 F.2d 718 (8th Cir.1967) *cert. denied*, 390 U.S. 951,
88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

*Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998) . . . .     12, 13

*Powell v. Spence*, 35 P.2d 925 (Okla. 1924) . . . . . . . . . . . . . . . . . . . . . . .     20

*Ratner v. Scientific Resources Corporation*, 53 F.R.D. 325 (S.D.Fla.1971),
appeal dismissed 402 F.2d 616 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . .     22

*Shamrock Oil & Gas Corp v. Sheets*, 313 U.S. 100 (1941) . . . . . . . . . . . . . .   11

*Slover v. Equitable Variable Life Ins. Co.*, 443 F.Supp.2d 1272
(N.D. Okla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Smith v. Voss Oil Co.*, 166 F.Supp. 905 (D. Wyoming 1958) . . . . . . . . . . .   11

*Smoot v. Chicago, Rock Island and Pacific Railroad Co.,* 378 F.2d 879
(10th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 13

*Sparks v. St. Louis & San Francisco Railroad Corp.*, 366 F.Supp. 957
(N.D. Okla. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Town of Freedom v. Muskogee Bridge Co.*, Inc., 466 F.Supp. 75
(W.D. Okla. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Walder v. Paramount Publix Corp.*, 132 F.Supp. 912 (S.D.N.Y.1955) . . . .   22

*Wilson v. Webb*, 2009 OK 56, 221 P.3d 730 . . . . . . . . . . . . . . . . . . . . . . . .   14

*Wright v. Metropolitan Life Ins. Co.*, 74 F.Supp.2d 1150 (N.D. Ala. 1990)   13

**Statutes**

28 U.S.C.A. §1446(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

24 Okla. Stat. § 113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

24 Okla. Stat. §116 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17, 18

24 Okla. Stat. § 121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

76 Okla. Stat. §1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

76 Okla. Stat. §2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

**Treatises**

15A C.J.S. Conspiracy §8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

15A C.J.S. Conspiracy §19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

15A C.J.S. Conspiracy §22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

15A C.J.S. Conspiracy §23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

10 Fla. Jur.2d Conspiracy—Civil Aspects §5 . . . . . . . . . . . . . . . . . . . . . . . .    22

COME NOW Plaintiffs, Johnny "Dale" Floyd, Virginia Floyd, Jennifer Gail Robinson, Lorena Ann Goforth, and Joanne Paul (collectively "the Floyd Family"), and object to the removal of this action and move to remand it because the removal was improper. This Court has no subject matter jurisdiction as there is no diversity. Defendant Kinder Morgan contends that this Court should have subject matter jurisdiction based on its allegation that Midwestern Gas Transmission Co. (which has a principal place of business in Tulsa County, Oklahoma) ("Midwestern") and Philip Elias (a resident of Creek County, Oklahoma) ("Elias") were improperly joined as purportedly "nominal" parties. However, the Floyd Family will pursue valid claims against all Defendants, including Midwestern and Elias, who played an integral part in the actions giving rise to the Floyd Family's claims and who are proper Defendants in this matter.  In support of this Motion, the Floyd Family submits the following brief.

## BRIEF IN SUPPORT

### I.   STATEMENT OF THE CASE

#### A.  *Synopsis of the Floyd Family's Claims:*

Plaintiff Dale Floyd was the pastor at Bristow Assembly of God Church, and he and his family (the other Plaintiffs, here) lived on what is now a designated Superfund site from 1991-1995. This case arises out of harm to the Floyd Family from hazardous conditions on and around the land the Floyd Family lived and worked on, caused and concealed by the wrongful acts of the Defendants, acting in concert, including Midwestern and Elias. Defendants caused and contributed to the harm to the Floyd Family: (i) through their

1

operations, (ii) by the materials they left behind that were mostly latent and hidden from view, and **(iii) by the specific actions taken by Defendants, including Midwestern and Elias, who acted in concert to: (a) conceal the pollution for the purposes of avoiding liability and shift assets to avoid payment to the Floyd Family and others similarly situated, (b) unlawfully dump pollutants into protected waters, (c) leave pollution on land, causing continuing harm, to enrich themselves to the detriment of the Floyd Family and others, and (d) otherwise act pursuant to unlawful, conspiratorial agreements, to which each Defendant was a part, all by way of a conspiracy spanning decades, involving fraud, deceit, pollution and harm that was hidden from the Floyd Family and others**.[1]

B. _Non-Diversity of Parties:_

The Floyd Family filed its original Petition in the District Court of Creek County, Oklahoma, on November 6, 2020. (Exhibit 1- Plaintiffs' Petition). As set forth in the Petition, <u>Plaintiffs</u> Dale Floyd, Virginia Floyd, and Joanna Paul are residents of and/or domiciled in the State of **Oklahoma**, and Jennifer Robinson and Lorena Goforth are

---

[1]   While Midwestern and Elias both took part in the conspiracy, their roles were vastly different, so the Floyd Family is unsure why Elias stated in his motion for extension of time to answer petition [Doc. 34] that the "only claim asserted against Elias is a claim for fraudulent transfer …" That is wholly untrue; the Floyd Family did not bring suit against Elias for fraudulent transfer, but rather hiding, dumping, and concealing contamination to make his land appear uncontaminated and therefore more valuable. The Floyd Family notes that Midwestern's motion for extension of time to answer petition [Doc. 21] uses that identical language; perhaps Doc. 34 is a cut-and-paste of Doc. 21. But the Court should be aware Doc. 34 is confusing and inaccurate.

residents of Arkansas. While the BP, Marathon, and Kinder Morgan entities and the Bolin entities are incorporated/domiciled outside of Oklahoma, <u>Defendant Midwestern</u> has its principal place of business in Tulsa, **Oklahoma**, and <u>Defendant Elias</u> is a resident of Creek County, **Oklahoma**. (Ex. 1). Therefore, it is undisputed by Kinder Morgan that if Midwestern and/or Elias are proper parties to this action, this case **must be remanded** to the District Court of Creek County.[2]

C. *The Allegations Against Elias in the Floyd Family's Petition:*

Against Philip Elias, a resident of Creek County, State of Oklahoma, the Floyd Family's Petition alleges:

21.      **Philip Elias** is a resident of Creek County, State of Oklahoma, who owned or operated lands and/or facilities within the Wilcox site and adjacent to the Church property that contained pollutants originating from activities at the refineries

---

[2]      In 2015, three other Bristow families and a Church (Oklahoma residents) filed suit in Creek County against BP, Marathon, Kinder Morgan, and the Bolins (all non-Oklahoma residents), plus various prior landowners (Oklahomans) in the chain of title on the contaminated land. **The Church and the other families did not sue Midwestern and only sued Elias as an owner in the chain of title** because the roles of those parties in the wrongdoing was wholly unknown to those plaintiffs at the time. Kinder Morgan removed those cases to this Court, arguing that the prior landowners, like Elias, were alleged to only be passive, nominal parties, and Judge Kern ruled that the prior landowners' passive, nominal-party role prevented remand. After discovering Midwestern's and Elias's actual roles, well into that 2015 litigation, those Bristow families and Church attempted to amend their pleadings to include those wrongdoers as defendants. Judge Kern ruled that such amendment was too late and that allowing the amendment would destroy federal diversity jurisdiction, requiring remand, as the defendants had argued. [Doc. 283 in *Bristow First Assembly of God, et al. v. BP plc, et al.*, 15-cv-523-TCK-CDL]. Here, however, the Floyd Family joined Midwestern and Elias at the outset of this litigation; therefore joinder is not "late," and, as recognized by Judge Kern, diversity does not exist. **And, here, Floyd Family has joined Midwestern and Elias as party defendants because their overt actions in furtherance of the conspiracy to fraudulently cover-up and hide the contamination and assets injured the Floyd Family and others similarly situated.**

3

and associated facilities on the Wilcox site and on the lands owned and operated by the Marathon Defendants north of the Wilcox site where the Transcontinental/Ohio refinery was located. **Elias entered into a plan and agreement with the Kinder Morgan Defendants to make Elias's land appear more valuable and uncontaminated and for Kinder Morgan and Elias to hide contamination that they knew to exist on the Wilcox site in order to deceive others, including Plaintiffs, who might otherwise discover the contamination and warn potential victims of the pollution. Pursuant to that plan and agreement, Kinder Morgan (through Tenneco) agreed to, and did, unlawfully cut a berm containing contaminated liquids, allowing the contaminated liquids to flow into the Sand Creek, and bulldozed soils over the contaminated impoundment and surrounding areas to cover up and hide the solid contaminants and remaining liquids in the impoundment, as further described hereafter. Elias thereby acted in concert with Kinder Morgan to discharge, cover up, hide, and maintain the harmful and hazardous commingled pollutants contributed by all the Operational Defendants on the Wilcox Site and the Transcontinental/Ohio Site.**

\*\*\*

46.     Further, upon information and belief (and as discussed in greater detail above and below), the waste buried by Tenneco (**in concert with Elias**) constituted solid and/or hazardous waste as defined by Oklahoma law, and burying such waste (as described in more detail above and below) violates the Oklahoma Solid Waste Management Act and/or Oklahoma regulations applicable to solid and/or hazardous waste. By way of example, and not by way of limitation, portions of the pollution caused by the Refineries constitutes solid waste as defined in 27A Okla. Stat. §2-10-103(20).  And, by burying the waste on the Wilcox Site, Tenneco (**in concert with Elias**) disposed of the solid waste at a site or facility for which a permit for solid or hazardous waste disposal was not issued by DEQ, in violation of 27A Okla. Stat. §2-10-301.

\*\*\*

54.     **By way of example, and not by way of limitation, on March 18, 1998, Tom Beer of Ecology and Environment, Inc. (a contractor for the U.S. Environmental Protection Agency) reported to his company and the EPA that Tenneco Oil Company used heavy equipment and equipment operators to cover oily waste at the ground surface and within tank berms with clean soil. By moving clean soil over contaminated soil, Tenneco Oil Company (a predecessor-in-interest to Kinder Morgan), in concert with Elias, quite literally buried, covered up, and illegally dumped its contamination and that of its predecessor companies to fraudulently conceal the wrongdoing of Defendants.**

4



**Figure 11:  DEQ map demonstrating Pond 2.**

55.     **By way of further example, and not by way of limitation, Tenneco (in concert with <u>Elias</u>) used bulldozers or other heavy equipment to cut the berm retaining the hazardous waste in Pond 2 with the express purpose of draining the hazardous waste in Pond 2 into the Sand Creek. Upon information and belief, the cut berm in Pond 2 allowed hazardous waste and contaminants to flow from Pond 2 to the Sand Creek over a period of several years.  Cutting the berm of Pond 2 to discharge contaminants into the Sand Creek was the functional equivalent of illegally dumping waste directly into the Sand Creek.**

5



**Figure 12:  Agency map showing cut berm and probable point of entry into Sand Creek.**

56.     Tenneco's scheme to hide the oily waste by covering it with clean soil and to dump hazardous waste into the Sand Creek, **with __Elias's agreement__**, were acts fitted to deceive future purchasers and land occupiers of the property under 15 Okla. Stat. §58. Specifically, Tenneco (**in concert with __Elias__**) intended to deceive future purchasers and land occupiers into thinking that contamination on the Wilcox Site either did not exist at all, or, if the contamination was to be discovered, that it existed to a lesser extent that it does in reality.

57.     Moreover, pursuant to 76 Okla. Stat. §2, the Kinder Morgan Defendants (as successors to Tenneco) are liable for willful deceit, because they intended to induce claimants, future buyers, and others to alter their position to their detriment. Among other reasons, the actions of Tenneco (**in concert with __Elias__**) amount to willful deceit because of the injury or risk presented to claimants, future buyers, and others, including personal injury through exposure to contaminants and damage to property values when the buried contamination was eventually uncovered and brought to light. **Tenneco and __Elias__ were required to disclose the existence of the buried waste**, **both because they knew or should have known the waste was harmful to human health, property rights, and the environment, and because the act of illegally burying or discharging the waste gave rise to an additional duty to disclose.**  Plaintiffs, the Church and other property owners and land occupiers on the Wilcox site are of the particular class of persons whom Tenneco and __Elias__ intended to deceive**.

6

\*\*\*

59.     For the same reasons, the actions of Tenneco and those acting in concert with it give rise to **civil conspiracy**. Specifically, Tenneco entered into an **unlawful agreement in an attempt to hide the waste by burying it or discharging it**, committed one or more unlawful acts by burying the waste and discharging the contaminants in Pond 2 into the Sand Creek (including, but not limited to, violating Oklahoma's solid waste and hazardous waste statutory and regulatory provisions), and the Plaintiffs and others were damaged as a result. Among other reasons, the Plaintiffs were damaged because waste buried by Tenneco (**in concert with Elias**) has become commingled with other legacy waste created by the Refineries, which moves in a generally south direction over Church land and into the Sand Creek. Plaintiffs seek recovery of all damages and injuries caused by Operational Defendants to Plaintiffs' property and persons, including personal harm, personal annoyance and inconvenience, endangerment of comfort, health, tranquility and safety, and for Plaintiffs having been rendered insecure in their lives, health and use of the Church Property. Further, Plaintiffs are entitled to punitive damages to punish Operational Defendants for their actions and to deter others similarly situated from acting in a like manner.

D.  *The Allegations Against Midwestern in the Floyd Family's Petition:*

Specifically against Midwestern, a company with its principal place of business in

Tulsa, Oklahoma, the Floyd Family's Petition alleges:

19.     Defendant Midwestern is a Delaware company with its principal place of business in Tulsa, Oklahoma. Midwestern may be served through its registered agent: National Registered Agents Inc., 1833 South Morgan Road, Oklahoma City, OK 73128. At the time of the events giving rise to Plaintiffs' claims against Midwestern,[30] but only recently disclosed to Plaintiffs, **Midwestern was the sole shareholder of EPEC, and received payment of approximately $93,000,000 in accounts receivable shortly after EPEC learned of EPEC's potential liability for contamination of the Church property and other property. However, despite knowing that Plaintiffs (and others similarly situated to Plaintiffs) held**

---

[30]     At the time of the events giving rise to Plaintiffs' claims against Midwestern, Midwestern was owned and/or controlled by El Paso Corporation. In or about 2001, El Paso Corporation sold Midwestern to Northern Border Partners L.P ("Northern"). In or about 2006, Northern sold Midwestern to ONEOK, Inc.  Midwestern continues to operate its business out of its headquarters and corporate office in Tulsa, Oklahoma.

**claims against EPEC related to predecessor liability concerning the Wilcox Site, EPEC dissolved and transferred assets to <u>Midwestern</u> without any notice and without the knowledge of Plaintiffs and others of EPEC's existence, potential liability or dissolution. Under applicable Delaware and/or Oklahoma law, <u>Midwestern</u> is liable for all or part of the claims brought against EPEC because: (a) EPEC had actual knowledge of claims and obligations related to the Wilcox Site; (b) EPEC did not make reasonable provision to pay all obligations related to the Wilcox Site; and (c) EPEC nonetheless distributed its assets to Midwestern (the sole stockholder)**.

***

36.     By way of further example, and not by way of limitation, and upon information and belief, in or around 1994 EPEC was notified by government representatives of possible pollution related to the Wilcox Site. Shortly after learning of its potential liability for the Wilcox Site, EPEC (a subsidiary of El Paso Energy Corporation) **purported to transfer its accounts receivable** (amounting to approximately $93 million) **to <u>Midwestern</u>** (EPEC's sole shareholder and, at the time, a subsidiary of El Paso Energy Corporation), **and <u>Midwestern</u>, in turn, purported to transfer the accounts receivable to Tennessee Pipeline (another subsidiary of El Paso Energy Corporation)**. EPEC then created the Trust to hold its remaining assets and liabilities, including those related to the Wilcox Site, with EPE (yet another El Paso Energy Corporation subsidiary — this one created for the sole purpose of serving as trustee) serving as trustee, and with the Tennessee Pipeline (again, an El Paso Energy Corporation subsidiary) being named as the sole beneficiary of any remainder trust assets.

***

60.     EPEC, Tennessee, the Trust, and EPE (and their successor, Kinder Morgan), and **<u>Midwestern</u> are also liable for fraudulent transfer**. Specifically, upon notice that DEQ was investigating pollution at the Wilcox Site, EPEC attempted to dissolve and distribute all assets to affiliate and subsidiary companies while retaining all liability for the Wilcox Site (as an entity without assets). To achieve this goal, EPEC, Tennessee, the Trust, **<u>Midwestern</u>**, and EPE **engaged in a multi-level, conspiratorial scheme of constructive fraud**.

61.     On or about December 18, 1998, EPEC (an El Paso Energy Corp. subsidiary) filed a certification of dissolution.

62.     Upon information and belief, EPEC never gave landowners or any residents living on the Wilcox Site (or any other persons in the Bristow, Oklahoma, area) notice of dissolution or the right to make claims regarding pollution from the Refineries.

8

63.     Upon or near dissolution, EPEC made a fraudulent mass transfer of its remaining assets (approximately $93,000,000 in accounts receivable) to **Midwestern**, the sole shareholder of EPEC at that time.

64.     **Midwestern then fraudulently transferred those accounts receivable to Tennessee (another El Paso Energy Corp. subsidiary)**.

65.     On or about March 9, 2001, approximately three years after filing the certification of dissolution, long after all the Defendants had been contacted regarding their liability for the pollution at the Refineries, and years after Tenneco's fraudulent cover-up activities, EPEC created the Trust and placed its remaining assets in the Trust, with EPE (another El Paso Energy Corp. subsidiary) as trustee and Tennessee as beneficiary.



**Figure 13:  How El Paso entities moved assets from one affiliate to another.**

66.     **The transfers from EPEC to <u>Midwestern</u> and the Trust were transfers fraudulent to creditors within the meaning of 24 Okla. Stat. §116 because EPEC made the transfers either with actual intent to hinder, delay, or defraud those harmed by the contamination or without receiving a reasonable equivalent value in exchange for the transfer. Further Midwestern and EPEC (as trustee) did not accept the transfer of assets from EPEC in good faith and for a reasonably equivalent value**. Kinder Morgan has ratified the actions of its

9

predecessors and has sought to retain the benefits derived from the wrongful actions and inactions.

67. Plaintiffs expressly seek: (a) a determination that the scheme was fraudulent and conspiratorial; (b) avoidance of the transfer or obligation to the extent necessary to satisfy their creditor claims; (c) attachment or other provisional remedy against the assets transferred or other property of the transferees as provided by law; and (d) any other relief the circumstances may require including any relief sought herein under other claims for relief, whether legal or equitable, actual or punitive, statutory or common law.

E. *Kinder Morgan's Wrongful Removal:*

Notwithstanding these facts and claims, Kinder Morgan improperly removed this case to this Court by filing a Notice of Removal on March 24, 2021 [Doc. 2]. Kinder Morgan's Notice of Removal admits the sole basis for removal is its (baseless) allegation that diversity exists because the non-diverse Defendants were improperly joined as nominal and improper parties. That is not the case. The Floyd Family's claims against Midwestern and Elias (and all other Defendants) meet Oklahoma's notice pleading standard and are not subject to dismissal. Because the Floyd Family have asserted valid claims against Oklahoma (and all other) Defendants, the Court must disregard Kinder Morgan's assertion of "fraudulent joinder." Without fraudulent/improper joinder, diversity does not exist in this case, and this Court lacks subject matter jurisdiction, and the case should be remanded.

II. **REMOVAL STATUTES ARE STRICTLY CONSTRUED AGAINST REMOVAL, AND THE BURDEN OF PROOF IS ON THE PARTY SEEKING TO REMOVE THE CASE.**

Removal statutes are to be strictly construed, and all doubts are to be resolved against removal. *Fajen v. Foundation Reserve Ins. Co., Inc.*, 683 F.2d 331 (10th Cir. 1982)

(citing *Shamrock Oil & Gas Corp v. Sheets*, 313 U.S. 100 (1941)). Removal of cases is purely statutory. *Chavez v. Kincaid*, 15 F.Supp. 1118 (D.N.M. 1998) (citing *McCurtain County Prod. Corp. v. Cowett*, 482 F.Supp. 809, 812 (E.D. Okla. 1978)). The burden is on the party seeking to remove the case to federal court to establish a right to do so, and a case should not be removed if doubt exists as to right of removal in the first instance. *Smith v. Voss Oil Co.*, 166 F.Supp. 905 (D. Wyoming 1958). Any doubt as to the propriety of removal must be resolved in favor of remand. *Id.*; *Douglass v. Park City Assoc.*, 331 F.Supp. 823 (E.D. Penn. 1971). Kinder Morgan agreed in its Notice of Removal that the Court's jurisdiction over this matter is entirely dependent upon a finding of improper joinder, admitting that only the Floyd Family and several Defendants are diverse, while other Defendants, like Midwestern and Elias, are citizens of Oklahoma and/or are principally domiciled in Oklahoma, like the Floyd Family. [Doc. 2- Notice of Removal].

### III. MIDWESTERN AND ELIAS WERE PROPERLY JOINED AS PARTY DEFENDANTS BECAUSE OF THEIR OVERT ACTIONS IN FURTHERANCE OF THE CONSPIRACY TO FRAUDULENTLY COVER UP AND HIDE THE CONTAMINATION AND ASSETS.

#### A. *Fraudulent Joinder Law:*

Fraudulent or improper joinder exists **where no cause of action is possible** against the non-diverse defendant. *See, Smoot v. Chicago, Rock Island and Pacific Railroad Co.,* 378 F.2d 879 (10th Cir. 1967). To show fraudulent/improper joinder to defeat diversity, a defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or **that there is no possibility, based**

11

on the pleadings, that a plaintiff can state a cause of action against the non-diverse

**defendant**. *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998); *Hart v.*

*Wendling*, 505 F.Supp. 52 (W.D. Okla. 1980); *Town of Freedom v. Muskogee Bridge Co.*,

Inc., 466 F.Supp. 75 (W.D. Okla. 1978). The standard for determining that no cause of

action can be sustained against the nondiverse defendant is similar to the standard for

granting a motion to dismiss for failure to state a claim against that defendant. *Slover v.*

*Equitable Variable Life Ins. Co.*, 443 F.Supp.2d 1272, 1278-79 (N.D. Okla. 2006). Thus,

in order to reach a conclusion that fraudulent/improper joinder exists here, this Court must

determine there is no possibility that the Floyd Family could prevail on any plausible claim

against Midwestern and/or Elias.

    B.  *Heavy Burden of Proving Fraudulent/Improper Joinder:*

       In this regard, a defendant seeking removal bears a **heavy burden** of proving

fraudulent/improper joinder, and **all factual and legal issues must be resolved in favor**

**of the plaintiff**. *Id.* The issue of fraudulent/improper joinder must be capable of summary

determination and be **proven with complete certainty**. *Muskogee Bridge, supra.* The

Court must be able to grant a motion to dismiss the resident defendant for failure to state a

claim upon which relief may be granted. *Id.*; *Sparks v. St. Louis & San Francisco Railroad*

*Corp.*, 366 F.Supp. 957 (N.D. Okla. 1973); *Bohanan v. Atchison, Topeka and Santa Fe*

*Railway Co.*, 289 F.Supp. 490 (W.D. Okla. 1968). The fact that a plaintiff might ultimately

fail to obtain a judgment is immaterial. *Id.* If there is **even a mere possibility** that a state

court would find that the complaint states a cause of action against any one of the resident

defendants, the federal court must find that joinder was proper and remand the case to state court. *Id*; *Batoff v. State Farm Ins. Co.*, 977 F.2d 848 (3rd Cir. 1992). Even when a case is weak (unlike here) fraudulent/improper joinder is inapposite. *Wright v. Metropolitan Life Ins. Co.*, 74 F.Supp.2d 1150 (N.D. Ala. 1990).

The Tenth Circuit clearly set forth the fraudulent/improper joinder standard in the case of *Montano v. Allstate Indemnity*, 211 F.3d 1278, 2000 WL 525592 (10th Cir. 2000):

The case law places a heavy burden on the party asserting fraudulent joinder. A representative example states:

> To prove their allegation of fraudulent joinder [the removing parties] must demonstrate that there is no possibility that [plaintiff] would be able to establish a cause of action against [the joined party] in state court. In evaluating fraudulent joinder claims, we must initially resolve all disputed questions of fact and all ambiguities in the controlling law in favor of the non-removing party. We are then to determine whether that party has any possibility of recovery against the party whose joinder is questioned.

*Hart*, 199 F.3d at 246 (quotation omitted); *see Pampillonia v.. RJR Nabisco, Inc.*, 138 F.3d 459, 461 n. 3 (2d Cir.1998) (citing cases); *cf. Smoot v. Chicago, Rock Island & Pac. R.R. Co.*, 378 F .2d 879, 882 (10th Cir.1967) (finding fraudulent joinder where non-liability of joined party was "established with complete certainty upon undisputed evidence."). This standard is more exacting than that for dismissing a claim under Fed.R.Civ.P. 12(b)(6); indeed, the latter entails the kind of merits determination that, absent fraudulent joinder, should be left to the state court where the action was commenced. *See Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851-53 (3d Cir.1992) ("A claim which can be dismissed only after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction."). Finally, as the reference to "a cause of action" in the quoted passage reflects, remand is required if any one of the claims against the non-diverse defendant, here Ms. Marsh, is possibly viable. *See Green v. Amerada Hess Corp.*, 707 F.2d 201, 207 (5th Cir.1983) ("Even if [plaintiff] were [precluded] from pursuing all his claims save one in state court, a remand would be necessary.).

See *Chapparo v. Tu*, 2007 WL 2948669 (W.D. Okla. 2007); *Hames v. Bayer AG*, 2004 WL 5363840 (W.D. Okla. 2004); *Moseley v. Wyeth*, 2002 WL 32991341 (W.D. Okla. 2002).

C. *Liberal Construction of Pleadings:*

It is well-established under Oklahoma law that a plaintiff's petition should be **liberally construed**. *Honeywell v. GADA Builders, Inc.*, 2012 OK CIV APP 11, ¶20, 271 P.3d 88, 95-6. Oklahoma courts have repeatedly held, regarding notice pleading:

> In 1984, Oklahoma adopted the Oklahoma Pleading Code (Pleading Code) and we became a notice pleading state. **All that is required under notice pleading is that the petition give fair notice of the plaintiff's claim and the grounds upon which it rests**. Section 2008 of the Pleading Code merely requires that the pleading shall contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Any requirement that a litigant correctly identify a theory of recovery or describe the remedy affordable for an asserted right's vindication is abolished and the doctrine of mandatory election of remedies has become an anachronism. Finally, for most claims, **the pleader need not utilize terms of art or legal phraseology**.

*Gens v. Casady School*, 2008 OK 5, ¶ 9, 177 P.3d 565, 569; *See also Wilson v. Webb*, 2009 OK 56, ¶9, 221 P.3d 730, 734.

Here, the Floyd Family's Petition sufficiently pleads serious claims of conspiracy, fraud, etc. against Midwestern and Elias. Specifically, the Floyd Family alleged that Elias entered into a plan, agreement, and civil conspiracy with the Kinder Morgan Defendants to make the land (which is part of the Wilcox Superfund site that includes the Church property) appear uncontaminated (and therefore more valuable) in order to deceive others, including people like the Floyd Family. Elias actively participated in cutting a berm containing contaminated liquids, allowing hydrocarbons to flow into and be carried along

14

by flowing water across the lands – the functional equivalent of illegally dumping waste directly into the creek – and he helped bulldoze soils to hide oily waste on the land where the Floyd Family lived, rendering them unsafe and oblivious to the peril that was befalling them, even though he had a duty to disclose the danger to them.

Regarding the Floyd Family's "fraudulent transfer" claim under the Uniform Fraudulent Transfer Act, 24 Okla. Stat. §112 *et seq.*, Kinder Morgan argues standing, shareholder liability, lack of specificity in pleading, and statute of limitations:

(i)     *Debtor-Creditor Status and Shareholder Liability:*

Section 113 of Title 24 of the Oklahoma Statutes simply defines "Creditor" as "a person who has a claim," and "Debtor" as "a person who is liable on a claim." Even the determination of who was a Creditor is a question of fact that must be viewed in the light most favorable to Plaintiffs, thus requiring remand. The Floyd Family was and is in the "creditor" category of persons as identified by the ODEQ in the PRP letter sent to the El Paso Defendants. (Exhibit 2 – PRP Letter). EPEC transferred – and Midwestern knowingly agreed to receive – $93 million of value from EPEC, which the Floyd Family's Petition alleges was part of a conspiratorial scheme to defraud creditors like them (not to mention the United States government). EPEC then dissolved itself, which was obviously known to Midwestern, and the two of them and others have used the scheme as an alleged defense to

15

shield the conspirators from liability and preserve the fraudulently transferred assets for themselves, while at the same time saying the assets were set aside for creditors.[4]

*(ii)     Insufficient Pleading:*

The Floyd Family's Petition is replete with allegations that Midwestern intended to defraud the Floyd Family (which is the only "element" necessary to plead, the subsections being in the disjunctive).[5] Notice pleading does not require expansive evidentiary allegations to show a party's possible liability under a specifically-pleaded statutory violation, and the remedy for insufficient particularity is to remand to the state court to allow amendment, if necessary, not have a federal court without jurisdiction make a merits-based determination.

---

[4]      Kinder Morgan asserts that the Floyd Family was **not a claimant/creditor** but insists that the Floyd Family **should have made a claim earlier** and are now allegedly time barred because they did not, showing the disingenuous nature of Defendants' positions. How can a **non**-claimant/creditor make a claim? Kinder Morgan's inherently contradictory argument makes it clear it considers the Floyd Family a claimant/creditor. Elias's and Midwestern's possible liability to the Floyd Family is a **merits-based factual** determination that "should be left to the state court where the action was commenced." *Montano v. Allstate Indemnity*, *supra*. "A claim which can only be dismissed after an intricate analysis of state law is not so wholly insubstantial and frivolous that it may be disregarded for purposes of diversity jurisdiction" and "remand is required if **any one** of the claims against the non-diverse defendant … is possibly viable." *Id.* Elias's and Midwestern's possible liability eliminates federal diversity jurisdiction. If, on remand, Kinder Morgan prevails on motions to dismiss Elias and Midwestern in the state court proceeding, it can **then** seek to remove the case to federal court, but not before and not until that state court determination. 28 U.S.C.A. §1446(b)(3).

[5]      Moreover, the Floyd Family notes that Kinder Morgan does not deny subsection (A)(2) – that there was no reasonable equivalent value in exchange for the transfer.

16

    *(iii)    Statute of Limitations:*

      Kinder Morgan argues that the Floyd Family's claims are barred by the statute of

limitations set forth in Section 121 of Title 24 of the Oklahoma Statutes, but it only cites

the second subsection and not the others. The first subsection provides:

> A cause of action with respect to a fraudulent transfer or obligation pursuant to the provisions of the Uniform Fraudulent Transfer Act, Section 112 et seq. of this title, is extinguished unless action is brought:
>
> 1. Pursuant to the provisions of paragraph 1 of subsection A of Section 116 of this title,[6] within four (4) years after the transfer was made or the obligation was incurred or, if later, within one (1) year after the transfer or obligation was or could **reasonably have been discovered by the claimant**;

Kinder Morgan may claim that the Floyd Family could reasonably have discovered the

transfer more than a year before they filed suit, but that is a factual determination to be

made in state court by the trier of fact (presumably a jury). *See, Auto. Consulting Res., Inc.*

*v. Interstate Nat'l Dealer Servs., Inc.*, No. 17-CV-225-JED-FHM, 2020 WL 6994213, at

---

[6]     24 Okla. Stat. §116(A) provides:

A. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

1. with actual intent to hinder, delay, or defraud any creditor of the debtor; or
2. without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
a. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or
b. intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

The Floyd Family's Petition makes allegations that fall within this subsection.

*2 (N.D. Okla. Oct. 8, 2020) (holding "[w]here there is conflicting evidence regarding application of the discovery rule, the question of when the plaintiffs knew or should have known is a question of fact for the jury to decide") (citing *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 842 (Okla. 2001)).

More importantly, contrary to Kinder Morgan's claim that the Floyd Family only filed suit against Midwestern for "fraudulent transfer" under 24 Okla. Stat. §116, the Petition shows their claims are for statutory and **common law fraud and conspiracy**, as well as violations of other Oklahoma statutes like 76 Okla. Stat. §1 (general rights of others must be respected) and §§2 *et seq.* (deceit). In fact, ¶60 of the Floyd Family's Petition specifically alleges "a multi-level, **conspiratorial** scheme of constructive **fraud**," and ¶67 asks for a determination that Midwestern's actions were "**fraudulent** and **conspiratorial**" and seeks "relief, whether **legal or equitable, actual or punitive, statutory or common law**." The Floyd Family's Petition is 43 pages long, and it goes into great detail about how Midwestern and the other Defendants conspired to commit fraud – even showing in diagram form how the fraud and conspiracy involving Midwestern were committed since the scheme was complicated and meant to obfuscate the truth. If a court were to find such allegations lacking sufficient particularity or specificity but still having the **possibility** of liability, the remedy would be to order the Floyd Family to amend their pleadings. "The liberal granting of motions for leave to amend reflects the basic policy that pleadings should enable a claim to be heard on its merits." *Griffin v. Indep. Sch. Dist. No. 1 of Tulsa Cnty., Okla.*, No. 13-CV-0702-CVE-FHM, 2014 WL 585433, at *1 (N.D. Okla. Feb. 13,

2014) (citing *Calderon v. Kan. Dep't of Soc. And Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir.1999)). Clearly, Kinder Morgan **cannot demonstrate** that the Floyd Family has **no possibility** of recovery against Midwestern and Elias. Fraudulent joinder does not exist.

IV.   **AS A PARTICIPANT IN A CIVIL CONSPIRACY, IT IS IRRELEVANT THAT ACTIONS TAKEN BY ELIAS OCCURRED AFTER THE FLOYD FAMILY'S TENURE ON THE LAND.**[7]

The Floyd Family's Petition alleges that Elias entered into a plan, agreement, and civil conspiracy with the Kinder Morgan Defendants to hide, dump, and conceal contamination to make his land appear uncontaminated (and therefore more valuable) in order to deceive others, including people like the Floyd Family, who had been harmed by the hidden contamination. In 1998, Elias actively participated in: (i) cutting a berm containing contaminated liquids, allowing pollutants to flow into and be carried along by flowing water across the lands – the functional equivalent of illegally dumping waste directly into the creek, and (ii) bulldozing soils to hide oily waste on the land where the Floyd Family lived and worked. "A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means." *Gaylord Entertainment Co. v. Thompson*, 1998 OK 30, ¶40, 958 P.2d 128, 148.

> 'When a conspiracy is shown to have existed for the accomplishment of an object, **each of the conspirators** participating in such conspiracy **[is] responsible** for the acts of any one of said conspirators done in furtherance of such conspiracy.'

---

[7]   Although this section specifically addresses Kinder Morgan's argument about Elias having wrongfully acted after the conspiracy began, the conspiracy law cited throughout this brief also applies to Midwestern as a co-conspirator.

*Barsh v. Mullins*, 1959 OK 2, 338 P.2d 845, 847 (quoting *Blasdel v. Gower*, 173 P. 644

and citing *Powell v. Spence*, 35 P.2d 925). "The character and effect of a conspiracy are

not to be judged by dissecting it and viewing its separate parts but only by examining it as

a whole." 15A C.J.S. Conspiracy §1. "The gist of a civil action for conspiracy is damages

and not the conspiracy." *Barsh v. Mullins,* 338 P.2d at 847.

> Civil conspiracy is used to broaden the number of parties liable for tortious conduct. The purpose of the civil-conspiracy theory is to extend liability for a tort beyond the actual tortfeasor to any coconspirators who might have encouraged, facilitated, or planned the tort in furtherance of the conspiracy. It is merely a vehicle for imputing the tortious actions of one coconspirator to another to establish joint and several liability.

15A C.J.S. Conspiracy §8. "In essence, a civil conspiracy claim enlarges the pool of

potential defendants from whom a plaintiff may recover for an underlying tort." *Gaylord*

*Entertainment Co. v. Thompson*, 958 P.2d at 148.

> In a civil conspiracy, the acts of coconspirators are attributable to each other. Coconspirators are each responsible for the damage that the conspiracy caused. One conspirator is liable for the foreseeable acts or declarations of his or her coconspirator done in furtherance of the conspiracy regardless of whether the conspirator profits from the result of the conspiracy. It is not essential that each conspirator be shown to have acted in concert with his or her coconspirators. The fact that a conspirator did not actively participate in every act done in furtherance of the conspiracy does not absolve that conspirator from liability. Each action that is performed in a civil conspiracy is imputed to each coconspirator regardless of who actually performed the act. A conspiracy claim serves merely to expand liability for the underlying wrong to persons who are not directly involved in the wrongful actions, and includes those who merely plan, assist, or encourage the wrongdoer's acts, or who supervise or profit from the tortious conduct. Thus, all participants in a conspiracy are directly liable for injuries to others who are objects of the conspiracy regardless of whether the participants are active or passive conspirators. Liability may be imposed on various parties under a civil-conspiracy claim even if a specific party is not the immediate tortfeasor.

15A C.J.S. Conspiracy §19.

> Parties to a civil conspiracy are joint tortfeasors. The fact of a conspiracy, if proved, makes the act of any one conspirator chargeable to all and thus allows for the imposition of joint and several liability for acts of coconspirators committed in furtherance of the common design or conspiracy. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. Each participant is jointly and severally liable for all damages ensuing or naturally flowing from the wrongful conduct. Each participant is responsible regardless of whether or not he or she is the direct actor and regardless of the degree of his or her activity, whether the participant joins willingly or unwillingly in furtherance of the common end, or whether or not the participant is actually present when the acts in pursuance of the conspiracy are committed.

15A C.J.S. Conspiracy § 22.

Kinder Morgan argues that because most or all of Elias's bad acts occurred in 1998 – approximately three years after the Floyd Family departed the Church parsonage – his actions could not have caused injury to the Floyd Family. That is not the law.

> To render a person civilly liable for injuries resulting from a conspiracy of which he or she is a member, it is not necessary that the person join the conspiracy at the time of its inception as anyone who enters into such a common design is deemed a party to every act that is earlier or later done by any of the others in pursuance of it. Thus, **one who knowingly joins a conspiracy, <u>even at a later date</u>, takes the conspiracy as he or she finds it and is liable for all acts previously or later done in pursuance of the conspiracy**. To be liable, a person must join the conspiracy before its consummation. If the objective of the conspiracy has not yet been achieved when a coconspirator manifests an agreement to further the objective, the coconspirator becomes liable for all acts done in furtherance of the common objective, including earlier acts.

15A C.J.S. Conspiracy § 23. The Northern District of Oklahoma agrees. In *In re Home-Stake Prod. Co. Sec. Litig.*, 76 F.R.D. 351 (N.D. Okla. 1977), this Court noted the vast number of jurisdictions holding that one's knowing assistance or participation in a

21

conspiracy or fraudulent scheme gives rise to liability equal to that of the primary actors

and opined:

> The law is also clear that [the defendants] may be jointly and severally liable for all damages accruing **prior to the time that these defendants allegedly assisted or participated in the conspiracy or fraudulent course of conduct**. In *Walder v. Paramount Publix Corporation*, 132 F.Supp. 912, 920 (S.D.N.Y.1955), an antitrust action, Judge Weinfeld stated:
>
> > One final matter remains. The defendants Paramount Pictures Corporation and American Broadcasting-Paramount **urge that the complaint must be dismissed as to them since they were <u>not formed until 1949</u> and cannot be held for acts committed before they came into existence. This contention overlooks the fact that these defendants are charged with having <u>joined a conspiracy continuing from 1928 to the filing of the complaint</u>. Under well established principles of conspiracy law, they may be held as fully liable as the original or earlier participants in the conspiracy**. *Also see*: *In Re Nissan Motor Corp. Antitrust Litigation*, 430 F.Supp. 231 (S.D.N.Y.1977). Similarly, in *Ratner v. Scientific Resources Corporation*, 53 F.R.D. 325, 329 (S.D.Fla.1971), appeal dismissed 402 F.2d 616 (5th Cir. 1972), a securities action, the court commented:
> >
> > > Defendant Land Resources Corporation was **not yet in existence** at the time the agreement between the parties was executed, and claims, therefore, that it could not have made misrepresentations to plaintiffs. But 15 U.S.C. s 78j includes co-conspirators and **one who knowingly joins a conspiracy takes it as he finds it**, *Myzel v. Fields* (*supra*).

Jurisdictions throughout the United States adhere. *See, Koch v. Royal Wine Merchants, Ltd.*, 907 F.Supp.2d 1332, 1346 (S.D. Fla. 2012) (holding "[i]n a conspiracy, 'every act and declaration of each member of the [conspiracy] in pursuance of the original concerted plan and with reference to the common object is, in contemplation of law, the act and declaration of them all,' **even with respect to actions that took place before a conspirator joined**. 10 Fla. Jur.2d Conspiracy—Civil Aspects §5; *see also Charles v. Fla.*

22

*Foreclosure Placement Ctr., LLC*, 988 So.2d 1157 (Fla. 3d DCA 2008));*McFarland v. McFarland*, 684 F.Supp.2d 1073, 1085 (N.D. Iowa 2010) (citing *Myzel v. Fields*, 386 F.2d 718, 738 n. 12 (8th Cir.1967) ("one who knowingly joins a conspiracy **even at a later date** takes the conspiracy as he finds it."), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir.1970) ("One who **enters a conspiracy late**, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy"); *Hawk v. Perillo*, 642 F.Supp. 380, 387 (N.D. Ill.1985) (holding that once defendant "joined the conspiracy, it **became a party to every act previously or subsequently performed** by any of the other conspirators."); *Aughey v. Windrem*, 114 N.W. 1047, 1049 (1908) (holding that defendant could be held **liable** for previous acts of a conspiracy where he knowingly **entered into the conspiracy after** its inception));  *In re U.S. Oil and Gas Litigation*, 1988 WL 28544 (S.D. Fla.) (holding one who knowingly joins a conspiracy, **even at a later date**, "takes the conspiracy as he finds it" and is **liable for all acts previously or subsequently done** in pursuance of the conspiracy); *Favila v. Katten Muchin Rosenman LLP*, 188 Cal.App.4th (2010) (holding "It is the settled rule that 'to render a person civilly liable for injuries resulting from a conspiracy of which he was a member, **it is not necessary that he should have joined the conspiracy at the time of its inception**; everyone who enters into such a common design is in law a party to every act previously or subsequently done by any of the others in pursuance of it.'") (citing *de Vries v. Brumback*, 349 P.2d 532 (1960)). As a participant in

23

the conspiracy at all, Elias may be held responsible for all the acts (before and after his own) in furtherance of the conspiracy. Simply because he executed his "part" of the scheme at a time the Floyd Family had already moved from the property does not mean Elias can avoid responsibility for the harm befalling the Floyd Family because of the scheme.

## **CONCLUSION**

Kinder Morgan has not met its heavy burden to demonstrate that Plaintiffs have no possible cause of action, and this is particularly true at this point in the litigation where any defects in pleading could be cured by amendment. The Floyd Family has sufficiently plead causes of action and met the standard for notice pleading under Oklahoma law, and they have valid claims against the non-diverse Midwestern and Elias. As such, diversity does not exist, removal was improper and the case should be remanded.

/s/ Michael J. Blaschke
Michael J. Blaschke, OBA No. 868
Michael J. Blaschke, P.C.
Landmark Towers West, Suite 1000
3555 N.W. 58th Street
Oklahoma City, OK 73112
Phone: (405) 562-7771
Fax:   (405) 285-9350
mblaschke@thelawgroupokc.com
-and-
Allan DeVore, OBA No. 2328
Jandra Cox, OBA No.16610
DeVore Law Firm, PLC
5709 N.W. 132nd Street
Oklahoma City, OK 73142
Telephone: (405) 603-8585
dlf@devorelawok.com

***Attorneys for Plaintiffs***

24

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Kenneth H. Blakley | kblakley@elbattorneys.com |
| Travis Walter Brown | tbrown@elbattorneys.com |
| Robert Dale Edinger | redinger@elbattorneys.com |
| Jacqueline Gayle Stone | jstone@elbattorneys.com |
| Mark Banner | mbanner@hallestill.com |
| Dawson Andrew Brotemarkle | dbrotemarkle@hallestill.com |
| Archer Scott McDaniel | smcdaniel@ok-counsel.com |
| Stacy L. Acord | sacord@ok-counsel.com |
| Melissa Ann East | meast@ok-counsel.com |
| Steven Joseph Adams | sadams@gablelaw.com |
| Timothy J. Sullivan , II | tsullivan@gablelaw.com |
| Mike Walter Jones | joneslaw@swbell.net |

*/s/ Michael J. Blaschke*
Michael J. Blaschke